Jerry R. SHARP; Curtis Beard, aka Tony Wilson; Elmer Campbell; Joel Scott Reimer; Ronald L. Petersen; Joseph Aqui; Gilberto Soliz; Herman R. Paschke; Richard G. Turay; John F. Hall; Paul Begay; Randy Pedersen; Anthony Gallegos; Dennis Pryor; Rolando T. Aguilar; Samuel William Donaghe, Plaintiffs–Appellees,

v.

David B. WESTON; William Dehmer; John Anderson–Taylor; Norm Nelson; Kim Vandoren; Jack Sowers; John Rush; Crystal Dixon; Brenda Nelson; John Linard; Al Nerio; Peter Helsel; Scott Neil; John Doe; Jane Lanning; Jean Soliz, Director of Department of Social and Health Services; Mark J. Seling, PhD; Robert Smith, PhD, Defendants–Appellants.

Richard Garrett Turay,
Plaintiff–Appellee,

v.

David Special Commitment Center; Mark Seling; Dr. John Taylor–Anderson, individually and in his marital community and in his official capacity at the Special Commitment Center at Monroe, WA; Norm Nelson, individually and in his marital community and in his official capacity at the Special Commitment Center at Monroe, WA; William Dehmer; Joan Kirchoff; Karen Sullivan; Scott Neil; Peter Hazel, each in their individual capacity and in their official capacity as employees of the Department of Social and Health Services; Richard Bosse, in his individual capacity as an employee of the Department of Corrections; Steve Wahl; Andre Simon, Defendants–Appellants.

Nos. 99–35015, 99–35202.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 13, 2000

Filed Nov. 30, 2000

Sarah J. Coats (argued), Assistant Attorney General, Olympia, Washington, for the defendants-appellants.

John W. Phillips and Felix G. Luna, Heller, Ehrman, White & McAuliffe, Seattle, Washington, for plaintiffs-appellees Jerry R. Sharp, et al.

Karen F. Jones (argued), Graham & James/Riddell Williams, Seattle, Washington, for plaintiffs-appellees Richard G. Turay, et al.

Ronald L. Petersen and Jayzack J.S. White Crow-Reimer (Joel S. Reimer), Pro Se plaintiffs.

Appeals from the United States District Court for the Western District of Washington; William L. Dwyer, District Judge, Presiding. D.C. Nos. CV–94–00121–WLD, CV–91–00664–WLD.

Before: SCHROEDER, BEEZER, and HAWKINS, Circuit Judges.

MICHAEL DALY HAWKINS, Circuit Judge:

Appellants are the superintendent and clinical director of Washington's Special Commitment Center ("SCC") for persons civilly committed as sexually violent predators. The SCC operates on the theory, recently approved by the Supreme Court,[1] that such facilities provide treatment, not punishment, for offenders who have completed their criminal sentences. The appellants seek review of a district court order which denies their request to lift an earlier injunction and details additional steps which need to be taken to provide SCC residents with constitutionally adequate mental health treatment. Appellants contend the district court failed to properly defer to the judgment of qualified mental health professionals and that the scope of the modified order exceeds the court's authority. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1), and we affirm.

I.

SCC resident Richard Turay initially brought this action, claiming the conditions of his confinement violated his civil rights. A trial was held in 1994, and the jury found that SCC was not providing Turay and other residents constitutionally adequate mental health treatment. Turay received nominal damages and Judge Dwyer issued an injunction requiring SCC to bring the treatment program into compliance with constitutional requirements (the "Turay Injunction"). The district court couched the initial injunction in rather general terms, and required SCC to: adopt and implement a plan for hiring and training competent therapists; implement strategies to rectify the lack of trust between the residents and staff; implement a general treatment program for residents, including involvement of spouses and family members and all other generally accepted therapy components; develop individual treatment plans for each resident to mea-

---

**1.** *See Kansas v. Hendricks,* 521 U.S. 346, 367– 369, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997).

sure progress; and provide an expert in treatment of sex offenders to supervise and consult with treatment staff.

SCC was slow to comply with the Turay Injunction, so the district court appointed a special master, Dr. Janice Marques (one of the two individuals proposed by SCC), to assist SCC in compliance and to submit periodic reports to the court. Prior to issuing the order that is the subject of this appeal, the district court had received and reviewed 14 reports from the special master. The district judge had also held several evidentiary hearings on various motions by the plaintiffs for contempt and by SCC to dissolve the injunction, and personally visited SCC twice. Similar motions for contempt and dissolution prompted a new hearing in October 1998.

Meanwhile, another group of SCC residents also brought a court action seeking damages and injunctive relief relating to the confinement conditions, which was as-signed to Judge Rothstein (the "Sharp" case). SCC settled the damages claims in the Sharp case, and Judge Rothstein transferred the claims for injunctive relief to Judge Dwyer for simultaneous adjudication with the reconsideration of the Turay Injunction. In October 1998, Judge Dwyer conducted a three-day evidentiary hearing on the Turay/Sharp injunctive relief issues. In November 1998, the district court issued a lengthy order, detailing the history of the cases, the court's findings of fact and conclusions of law, and requiring the SCC superintendent and clinical director to take a number of fairly specific actions to bring the facility into compliance with constitutional requirements.[2] The appellants timely appealed from this order.

## II.

 In reviewing denials of motions to dissolve injunctions, we do not consider

2. Specifically, the 1998 order requires appellants:

(a) To carry out additional staff training at the SCC, with new residential care staff to finish the orientation training before beginning work on the unit, residential care and clinical staff to complete mental health training within four months of commencing their employment, and advanced training on the treatment of sexual deviance to be provided.

(b) To provide a coherent and individualized treatment program for each resident complete with understandable progress goals and a road map showing the way to improvement and release, such plan to include the components recognized as necessary for maximum treatment potential.

(c) To make adequate provision for participation by residents' families in rehabilitation efforts, including setting aside a room for visits by family members, permitting family visits with reasonable frequency and allowing prompt telephone access to residents in cases of family emergency, consistent with security.

(d) Pending the construction of a separate treatment-oriented facility, to reduce the negative effects of the current connection with MICC by taking the following steps:

(i) Eliminate the routine strip searches of SCC residents following every visit;

(ii) Eliminate the monitoring of residents' telephone calls and the bar on outgoing calls (other than collect);

(iii) Negotiate with MICC management to obtain better meal and activity schedules, and to eliminate harassment of residents by prisoners;

(iv) Acquire more adequate space within the MICC complex, e.g., by taking over all of a unit when new space is needed, with yard space adjacent thereto.

(e) To improve the treatment environment in the following respects:

(i) Use new living space to provide some separation between residents in treatment and those who have harassed treatment recipients;

(ii) Draft and implement fair and reasonable grievance procedures and behavior management plans; and

(iii) Afford reasonable opportunities to all residents for educational, religious, vocational/work, and recreational activities.

(f) To initiate and implement program oversight both by an internal review process and by an external body, either through a licensing organization or another entity.

(g) In the foregoing respects, and in others previously ordered, to take all reasonable steps to bring a constitutionally adequate program into reality rather than merely describing it on paper.

the propriety of the underlying order, but limit our review to the new material presented with respect to the motion to dissolve. *See Sierra On–Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1418 (9th Cir.1984). A party seeking modification or dissolution of an injunction bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction. *See Bellevue Manor Assocs. v. United States,* 165 F.3d 1249, 1255 (9th Cir.1999) (citing *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992)). In this case, the appellants contend there has been a significant change in facts because they have complied with the Turay Injunction and remedied the underlying constitutional violation. Thus, the district court was required to examine the existing situation at SCC to determine whether the changes in the SCC program were so significant as to warrant an end of court supervision. We review the district court's factual findings for clear error and its legal conclusions *de novo. See Walters v. Reno,* 145 F.3d 1032, 1047 (9th Cir.1998), *cert. denied,* 526 U.S. 1003, 119 S.Ct. 1140, 143 L.Ed.2d 208 (1999). We now turn to the requirements of the Turay Injunction and the district court's factual findings regarding SCC's compliance with the injunction.

The original Turay Injunction required SCC to adopt and implement a plan for initial and ongoing training and/or hiring of competent sex offender therapists. In 1998, the district court found there was still a need for additional staff training. Between the time of the original Turay Injunction and the 1998 hearing, the SCC facility was relocated to the McNeil Island Correctional Center ("MICC"), which is operated by the Department of Corrections ("DOC"). Because of the relocation, nearly 90% of the SCC staff was replaced, so at the time of the hearing many had been working at SCC for less than 6 months. Appellees also introduced evidence of a lack of consistency from therapist to therapist in the treatment of residents or in the application of standards to evaluate residents.

The Turay Injunction required SCC to develop and maintain individual treatment plans for residents that include objective benchmarks of improvement so as to document, measure and guide an individual's progress in therapy. In 1998, the district court found that this requirement remained unsatisfied. Testimony by several expert witnesses, including one of SCC's own experts, acknowledged that SCC still did not provide residents with any type of road map that could help residents track their progress or see the potential for cure and release, or if one existed, it was not in any form that the residents could understand. The special master also testified that some individuals who had been in treatment for four years were then assigned back to an orientation program. In its 1998 order, the district court also took notice of the standards for treating sex offenders promulgated by the Association for the Treatment of Sexual Abusers ("ATSA"), which characterizes such individual plans as critical for effective treatment.

The Turay Injunction required SCC to take steps to rectify the lack of trust between the residents and staff. In 1998, the court found that the environment at MICC was severely hampering effective treatment. Shortly after the court issued the Turay Injunction, SCC had stopped conducting strip searches of residents. However, when SCC relocated the facility to MICC, SCC adopted many DOC rules and regulations for SCC residents, including routine strip searches following every visit, monitoring of telephone calls, and restricted meal and activity schedules. At the 1998 hearing, several witnesses, including the special master and the SCC's clinical director and superintendent, testified that the prison atmosphere made it more difficult to provide mental health treatment. The SCC director testified that he found the routine strip searching to be an

"abomination" which made it more difficult for him to do his job.

The Turay Injunction required SCC to implement a general treatment program for residents, including all components customarily found in such programs, such as involvement of spouses and family members. The district court found that in 1998 there was still inadequate provision for participation by families. At the hearing, SCC officials described a series of plans and studies to improve family interaction, which had not yet been implemented. One of the residents testified that the only room for family visiting was also the prison personnel's locker room, so visits were interrupted frequently and were far from private. He also testified that residents were only permitted to hug their spouses at the beginning or end of visits, because SCC had adopted a DOC hugging rule applicable to the inmates at MICC.

The court also found the SCC program to be lacking several other generally accepted components of effective treatment programs, such as separation between residents in treatment and those who harass such residents, adequate grievance procedures and behavior management plans, and reasonable opportunities for educational, religious, vocational and recreational activities. This finding was based on various testimony by the special master, a court-appointed ombudsman, a SCC resident advocate, and one of appellee's expert witnesses.

Finally, the district court found that the SCC program lacked sufficient oversight, because the SCC advisory board limited itself to policy and planning advice. Although ATSA standards provide that oversight should be supplied by both an internal review process and an external body either through a licensing organization or another entity, SCC acknowledged that no group or entity was performing this function.

▮ Appellants' principal contention is that the district court did not properly defer to the professional judgment of the SCC superintendent and clinical director. In order to minimize the interference by the federal judiciary with the internal operations of state institutions, courts should show deference to the judgment exercised by a qualified professional. *See Youngberg v. Romeo,* 457 U.S. 307, 322, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). A decision made by a professional is presumptively valid, and "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323, 102 S.Ct. 2452.

At the time of the initial Turay Injunction in 1994, SCC was without a clinical director who was qualified to deal with sex offenders. As required by the Turay Injunction, SCC subsequently hired the appellants, Drs. Smith and Seling. Appellants argue that because they are qualified professionals exercising their discretion in fashioning a treatment program at SCC, the district court should not have inquired further. Appellants appear to suggest that because, in their capacities as mental health professionals, they believe they have complied with the legal requirements of the Turay Injunction and the Constitution in providing adequate mental health treatment, their decisions are beyond review. The district court correctly recognized that accepting such an argument would transfer the safeguarding of constitutional rights from the courts to mental health professionals. Conditions of confinement would be above judicial scrutiny and would depend on who happened to be in charge of a particular program.

▮ Although the state enjoys wide latitude in developing treatment regimens, the courts may take action when there is a substantial departure from accepted professional judgment or when there has been no exercise of professional judgment at all. *See Thomas S. by Brooks v. Flaherty,* 902

F.2d 250, 252 (4th Cir.1990) (holding that under *Youngberg,* decisions of professionals are presumptively valid but not conclusive, because the court has the authority to determine if there has been a substantial deviation from accepted standards). The district court therefore properly looked beyond the SCC administrators' assertions of compliance, and in this case, found that in several specific areas, SCC had not yet fulfilled the requirements of the Turay Injunction. In reviewing the record, we do not find that the district court failed to provide proper deference to appellants' professional judgment; rather, on the evidence before it, the district court correctly concluded that the appellants had made decisions about the program that fell well below professional standards for treatment of sexual offenders, or that certain decisions were not entitled to deference because they were not made in the appellants' professional judgment.[3] The district court's findings of fact are not clearly erroneous. There is ample evidence in the record to support each finding, based on the testimony not just of the appellees' experts, but upon neutral standards promulgated by the ATSA, by the testimony of the neutral special master (who was selected by SCC and appointed by the court for the specific purpose of helping SCC bring the program up to professional standards), and, in some instances, on the testimony of SCC's own experts and directors.

Appellants argue that the district court found each individual problem noted in the 1998 order to be a constitutional violation. They misread the district court's order; the court did not hold that conducting strip searches or failing to provide a private family visiting room is unconstitutional in and of itself. Rather, the district court, looking at the SCC program as a whole, concluded that although SCC had made some progress since the initial Turay Injunction (largely on paper), SCC needed to take further steps to bring a constitutionally adequate program into reality, which justified continued court supervision.

■ The appropriate legal standard for analyzing the constitutionality of SCC's treatment program is set forth in *Ohlinger v. Watson,* 652 F.2d 775, 778 (9th Cir. 1980). In *Ohlinger,* we held that the Fourteenth Amendment Due Process Clause requires states to provide civilly-committed persons with access to mental health treatment that gives them a realistic opportunity to be cured and released. *Id.* ("Adequate and effective treatment is constitutionally required because, absent treatment, appellants could be held indefinitely as a result of their mental illness...."). Because the purpose of confinement is not punitive, the state must also provide the civilly-committed with "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg,* 457 U.S. at 322, 102 S.Ct. 2452.

Based on the numerous inadequacies noted by the district court, we find no error in the court's conclusion that, taken as a whole, SCC still does not provide the type of treatment program that is constitutionally required for civilly-committed persons—one that gives residents a realistic opportunity to be cured or improve the mental condition for which they were confined. *See Ohlinger,* 652 F.2d at 779; *see also U.S. ex rel. Stachulak v. Coughlin,* 520 F.2d 931, 936 (7th Cir.1975) (recognizing that "[a]ll too often the 'promise of treatment has served only to bring an illusion of benevolence to what is essentially a warehousing operation for social misfits'") (quoting *Cross v. Harris,* 418 F.2d 1095, 1107 (1969)). Moreover, SCC residents were not receiving "more considerate treatment and conditions of confinement" than the inmates of MICC, as re-

---

3. For example, as appellees point out, the implementation of the DOC policies was not a treatment-directed decision made by the professional directors of SCC, but rather an adoption of the landlord's rules, often without even requesting a deviation for SCC residents.

quired by *Youngberg,* 457 U.S. at 322, 102 S.Ct. 2452.

The district court applied the correct legal standard to findings of fact that were not clearly erroneous. The appellants did not bear their burden of proving that circumstances had changed to the degree that court supervision was no longer required. Therefore, the district court did not err in refusing to dissolve the Turay Injunction.

### III.

■ Again relying on *Youngberg,* appellants argue that even if the district court did not err in refusing to dissolve the Turay Injunction, the scope of the 1998 order improperly intrudes upon matters that should be left to the discretion of qualified mental health professionals. We review the scope of injunctive relief for an abuse of discretion. *See Walters,* 145 F.3d at 1047.

■ Again, appellants argue from the proposition that each individual remedy prescribed in the 1998 order must, *by itself,* be constitutionally required. This is simply not the case. Once a constitutional violation has been found, a district court has broad powers to fashion a remedy. *See Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 15–16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). A court may order "relief that the Constitution would not of its own force initially require if such relief is necessary to remedy a constitutional violation." *Toussaint v. McCarthy,* 801 F.2d 1080, 1087 (9th Cir.1986). The district court's order does not suggest that private visitation rooms or opportunities for educational activities are, in and of themselves, constitutionally required. Rather, both the Turay Injunction and the 1998 order are aimed at curing the underlying constitutional violation of inadequate mental health treatment. *See Gluth v. Kangas,* 951 F.2d 1504, 1510 (9th Cir.1991) (injunction requiring prisoners be provided with specific office supplies was within dis-

trict court's discretion to determine appropriate relief for underlying constitutional violation). The 1998 order notes the areas in which the appellants have not yet complied with the Turay Injunction, and gives more specific directions on how to comply with the original order.

■ The initial Turay Injunction left much of the planning and implementation to SCC officials. At the time of the 1998 hearing (and at a number of hearings in between the 1994 and the 1998 orders), the district court found that few, if any, of its initial requirements had been satisfied and that in some instances progress had actually been set back (for example, by moving to the correctional facility). A history of noncompliance with prior orders can justify greater court involvement than is ordinarily permitted.

In *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), the Supreme Court held that, because of repetitive failures to comply with orders regarding conditions of confinement, the district court was "justified in entering a comprehensive order to insure against the risk of inadequate compliance." *Id.* at 687, 98 S.Ct. 2565. In *Hutto,* as in this case, the district court had originally issued a broad order giving the corrections officials wide latitude to correct the situation, and held various follow-up hearings to chart progress before going a step further and entering a detailed order. *Id.* at 683, 98 S.Ct. 2565. In this case, not only was there a history of noncompliance with the Turay Injunction, but at one point the district court even had to order the appellants not to interfere with an investigation at SCC by a court-ordered ombudsman.

In *Hutto,* the Court also noted that "the exercise of discretion in this case is entitled to special deference because of the trial judge's years of experience with the problem at hand and his recognition of the

limits on a federal court's authority in a case of this kind." *Id.* at 688, 98 S.Ct. 2565. Likewise, in this case, the district court judge was extremely familiar with the problem at hand: He conducted the initial trial, reviewed 14 special master reports, conducted various evidentiary hearings, and visited the facility twice personally. Also, as in *Hutto,* a reading of the district court's order will readily reveal that the district court did not lightly enter into the new order, but was cognizant of the proper limitations on his authority. In this case, the district court repeatedly recognized the limitations of *Youngberg* and stressed that the injunction should remain in force only as long as necessary to assure that the violation of rights has been cured. It should also be noted that one of the requirements, instituting an internal and external review process, is actually designed to end judicial oversight as soon as possible.

In light of the history of SCC's noncompliance with prior orders and the deference which we must give to the district judge in fashioning the scope of the remedy, the district court did not abuse its discretion with the scope of the 1998 order.

AFFIRMED.