**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JANE DOE, # 1; JANE DOE, # 2; NORLAN FLORES, on behalf of themselves and all others similarly situated, | Nos. 17-15381 17-15383 |
| *Plaintiffs-Appellants/Cross-Appellees*, | D.C. No. 4:15-cv-00250-DCB |
| v. | |
| JOHN F. KELLY, Secretary, United States Department of Homeland Security; KEVIN K. MCALEENAN, Acting Commissioner, United States Customs and Border Protection; RONALD VITIELLO, Chief, United States Border Patrol; JEFFREY SELF, Commander, Arizona Joint Field Command; PAUL BEESON, Chief Patrol Agent - Tucson Sector, *Defendants-Appellees/Cross-Appellants.* | OPINION |

Appeal from the United States District Court
for the District of Arizona
David C. Bury, Senior District Judge, Presiding

Argued and Submitted October 16, 2017
San Francisco, California

Filed December 22, 2017

Before:  Richard C. Tallman and Consuelo M. Callahan,
Circuit Judges, and David A. Ezra,[*] District Judge.

Opinion by Judge Callahan

## SUMMARY[**]

### Civil Rights

The panel affirmed the district court's preliminary injunction in an action brought by civil detainees confined in U.S. Customs and Border Protection facilities within the Tucson Sector of the U.S. Border Patrol who alleged they were subjected to inhumane and punitive treatment.

The district court granted a preliminary injunction requiring that defendants provide detainees with mats and

---

[*] The Honorable David A. Ezra, United States District Judge for the District of Hawaii, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

blankets after 12 hours. Defendants appealed, alleging that the district court misapprehended the standard set forth in *Bell v. Wolfish*, 441 U.S. 520 (1979), and that the order was too rigid and burdensome. Plaintiffs also appealed, alleging that the district court should have ordered defendants to provide the detainees with beds and mattresses, allow them access to showers, and deliver adequate medical care through medical professionals.

The panel held that the district court carefully considered plaintiffs' allegations of constitutional violations, recognized the guidance provided by the Supreme Court in *Bell*, and issued a limited preliminary injunction requiring defendants to provide detainees with mats and blankets after 12 hours. Defendants failed to show that, in doing so, the district court misapprehended *Bell* or that the preliminary injunction was overly rigid or burdensome.

The panel found unpersuasive plaintiffs' assertions that the district court should have required defendants to provide detainees with beds, showers, and medical treatment provided by medical professionals. The panel held that the district court recognized the unique mission of the Border Patrol and, at least for the purposes of a preliminary injunction, reasonably balanced the government's interests and the detainees' constitutional rights.

**COUNSEL**

James R. Sigel (argued), Robert J. Esposito, and Elizabeth G. Balassone, Morrison & Foerster LLP, San Francisco, California; Deanne E. Maynard, Sophia M. Brill, Bryan J. Leitch, and Lena H. Hughes, Morrison & Foerster LLP, Washington, D.C.; Louise C. Stoupe and Pieter S. de Ganon, Morrison & Foerster LLP, Tokyo, Japan; Colette Rainer Mayer, Morrison & Foerster LLP, Palo Alto, California; Linton Joaquin, Karen C. Tumlin, and Nora A. Preciado, National Immigration Law Center, Los Angeles, California; Kathleen E. Brody, Daniel J. Pochoda, and Brenda Muñoz Furnish, ACLU Foundation of Arizona, Phoenix, Arizona; James J. Cekola, Morrison & Foerster LLP, San Diego, California; Mary A. Kenney, Melissa E. Crow, and Aaron Reichlin-Melnick, American Immigration Council, Washington, D.C.; Elisa Della-Piana and Megan Sallomi, Lawyers' Committee for Civil Rights of the San Francisco Bay Area, San Francisco, California; Abigail L. Colella, Morrison & Foerster LLP, New York, New York; for Plaintiffs-Appellants/Cross-Appellees.

Christina Parascandola (argued), Trial Attorney; Sarah B. Fabian, Senior Litigation Counsel; William C. Peachey, Director; Chad A. Readler, Acting Assistant Attorney General, Civil Division; Office of Immigration Litigation, District Court Section, United States Department of Justice, Washington, D.C.; for Defendants-Appellees/Cross-Appellants.

**OPINION**

CALLAHAN, Circuit Judge:

The influx of detainees in the Tucson Sector of the U.S. Border Patrol in 2015 resulted in Defendants (federal government officials and agents) holding detainees being processed for longer periods of time in overcrowded and unsanitary cells at eight different stations. Plaintiffs brought this action alleging inhumane and punitive treatment, and seeking injunctive relief. The district court granted a preliminary injunction requiring that Defendants provide detainees with mats and blankets after 12 hours. Defendants appeal, alleging that the district court misapprehended the standard set forth in *Bell v. Wolfish*, 441 U.S. 520 (1979), and that the order was too rigid and burdensome. Plaintiffs also appeal, alleging that the district court should have ordered Defendants to provide the detainees with beds and mattresses, allow them access to showers, and deliver adequate medical care through medical professionals. We hold the district court did not abuse its discretion and properly applied precedent such that neither side has shown that the limited preliminary injunction is illogical, implausible, or without support in the record. *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc).

## I.  BACKGROUND

Plaintiffs filed this action in the United States District Court for Arizona on behalf of detainees confined in U.S. Customs and Border Protection Facilities within the Tucson Sector of the U.S. Border Patrol. The Border Patrol's mission is to detect and prevent the entry of certain individuals—including terrorists, unauthorized aliens, drug

smugglers, and other criminals—into the United States between ports of entry.  The Tucson Sector patrols 262 miles of the United States-Mexico border in southern Arizona, and, according to Defendants, in fiscal year 2016, "apprehended 64,891 individuals, the second highest of any Border Patrol sectors."  The number of individuals apprehended in the Tucson Sector varies widely.  Defendants represent that between 2009 and 2016, apprehensions each month ranged "from a high of 31,432 in March 2009, to a low of 4,071 in July 2015."

When a Border Patrol agent apprehends an individual, the person is taken to one of eight stations in the Tucson Sector. At the station, the Border Patrol processes the detainee, ascertaining the individual's identity and immigration and criminal history.  The individual is then repatriated, transferred into the custody of another agency, referred for prosecution in accordance with the law or, in rare circumstances, released.

Plaintiffs alleged that the conditions in the stations were deplorable and that it took up to three days for individuals to be processed before transfer.  Plaintiffs alleged that:

> detainees are packed into overcrowded and filthy holding cells, stripped of outer layers of clothing, and forced to endure brutally cold temperatures.  They are denied beds, bedding, and sleep.  They are deprived of basic sanitation and hygiene items like soap, sufficient toilet paper, sanitary napkins, diapers, and showers.  And they are forced to go without adequate food, water, medicine, and medical care.

In the fall of 2016, the district court certified the case as a class action.  Plaintiffs then sought a preliminary injunction.

## II.  THE DISTRICT COURT'S ORDERS

### A. The Standards for Reviewing Conditions of Confinement

After setting forth the appropriate standards for issuing a mandatory preliminary injunction, the district court considered the standards for reviewing conditions of confinement.  It first noted that when the government takes a person into custody, it must provide for the person's "basic human needs—e.g. food, clothing, shelter, medical care, and reasonable safety." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989); *see also Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

Citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979), among other cases, the district court concluded that when evaluating the constitutionality of pretrial detention conditions, it had to determine whether the conditions amounted to punishment. Citing *Demery v. Arpaio*, 378 F.3d 1020, 1030 (9th Cir. 2004), the district court explained that "[t]o constitute punishment, the governmental action must cause harm or disability that either significantly exceeds or is independent of the inherent discomforts of confinement."  The court noted that even in the absence of evidence of express intent, it may infer an intent to punish "if the restriction or condition is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective." *See Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1205 (9th Cir. 2008).

The district court noted that the Supreme Court held that "[m]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted and pretrial detainees." *Bell*, 441 U.S. at 546. Indeed, the Supreme Court commented that "in the absence of substantial evidence in the record to indicate that officials have exaggerated their responses to these conditions, courts should ordinarily defer to their expert judgment in such matters." *Id*. at 540 n.23 (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974)).

Based on these cases, the district court opined that a condition of confinement "violates the Fifth and Fourteenth Amendments if it imposes some harm to the detainee that significantly exceeds or is independent of the inherent discomforts of confinement and is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective." *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473–74 (2015). This led the court to reason that decisions defining the constitutional rights of prisoners establish a floor for Plaintiffs' constitutional rights. *See Padilla v. Yoo*, 678 F.3d 748, 759 (9th Cir. 2012). The district court concluded that it could presume Plaintiffs were being subjected to punishment "if they are confined in conditions identical to, similar to, or more restrictive than those under which the criminally convicted are held." *See Sharp v. Weston*, 233 F.3d 1166, 1172–73 (9th Cir. 2000).

The district court then observed:

> This is precisely the case here. Assistant
> Chief Patrol Agent for the Tucson Sector,

George Allen, admitted, when this Court asked him to compare the conditions of confinement at Tucson Sector Border Patrol stations with those afforded criminal detainees at the Santa Cruz County jail, that in jail, detainees have a bed, with blankets, clean clothing, showers, toothbrushes and toothpaste, warm meals, and an opportunity for uninterrupted sleep. Likewise, the conditions of confinement . . . improve once they are transferred from Border Patrol holding cells to detention centers operated by the United States Marshals.

The district court recognized that, in assessing the constitutionality of the conditions of confinement in the Border Patrol stations, due consideration had to be given to the nature, purpose and duration of an individual's time in the station. The stations are 24-hour operations where many detainees arrive in the evening and at night. The holding rooms are not designed for sleeping and have no beds. "Defendants assert[ed] that providing sleeping facilities and turning off lights would require structural changes at the facilities, create safety risks, and impede its purpose to provide 24-7 immigration processing." Defendants explained that when a detainee arrives at a station, outer-clothing is removed for security reasons, and detainees are placed into group-holding rooms based on age, gender, family units, or suspected criminal status. Processing includes obtaining biographical information and biometrics, submitting this information through the e3Nex Generation Identification system to determine prior criminal and immigration arrests, preparing an arrest report, immigration processing, consular notifications, and communication with family members and

attorneys as appropriate. Processing, if uninterrupted, absent any remarkable criminal or immigration history, takes between two and two and one-half hours.

But, there usually are interruptions. Discovery revealed that between June 10, 2015, and September 28, 2015, only about 3,000 of approximately 17,000 detainees were processed out of detention within 12 hours. About 8,644 detainees were held at a Border Patrol station up to 23 hours; 6,807 were held for up to 47 hours; 1,207 were held up to 71 hours; and 476 were held for 72 hours or more.

The district court accepted for purposes of the preliminary injunction that the Border Patrol's 2008 Hold Rooms and Short Term Custody Policy (2008 Policy) and the National Standards on Transport, Escort, Detention and Search (TEDS standards) provided for constitutional conditions of confinement. Although Defendants assert that these guidelines establish the status quo, the district court found that Plaintiffs had presented persuasive evidence that the basic human needs of detainees were not being met by Defendants' current practices.

### B. Plaintiffs' Specific Complaints

**1. Sleeping.** The district court recognized that other detention facilities must provide individuals held overnight with beds and mattresses, and, thus, the absence of either violates the detainees' due process rights. *See Thompson v. City of Los Angeles*, 885 F.2d 1439, 1448 (9th Cir. 1989), *overruled on other grounds by Bull v. City & Cty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010) (en banc); *Anela v. City of Wildwood*, 790 F.2d 1063, 1069 (3rd Cir. 1986). The court noted that of the 16,992 detainees held between June 10

and September 28, 2015, only 122 were recorded to have received a mat, and the others' bedding needs were met with only a Mylar sheet/blanket.  The court found that this was contrary to both the 2008 Policy and the TEDS standards.  It further noted:

> the harshness caused by the lack of mats and the inadequacy of the Mylar blankets is compounded by the Defendants' practices of keeping holding-cells lights turned on 24-7, feeding one of the three regular hot meals to detainees at 4:00 a.m., moving detainees in and out of holding cells throughout the night for processing, overcrowding cells which causes people to lie cramped together and next to toilet facilities or to sit or stand up, and because the hard concrete floors and benches retain the cold caused by low thermostat temperatures and make it too hard and cold to sleep.

The district court found the holding cells to be spatially inadequate.  The district court determined that "the holding-cell capacity numbers cannot accommodate the number of detainees being detained longer than twelve hours because detention of this duration requires them to lie down to sleep rather than sit up."

Defendants' expert opined that the Border Patrol facilities were on par with short-term holding cells typically used during the booking process in jail facilities.  The district court rejected the comparison because the booking process at a jail facility usually takes hours, instead of days.  The district court, however, accepted that the holding cells need to be

illuminated for security. On the other hand, it found no security or administrative reason "to wake up detainees by scheduling one of the three burrito meals at 4:00 a.m."

The court also found that the Mylar blankets do not provide insulation from the cold concrete, but merely prevent evaporation and retain 80% of body heat when wrapped around a person. In light of the sedentary nature of detention, the district court required that Defendants continue to monitor cell temperatures, which were maintained at temperatures between 71 and 74 degrees. The district court concluded that Defendants were violating Plaintiffs' constitutional right to sleep, and ordered that Defendants provide detainees held for longer than 12 hours mats and Mylar blankets.

**2. Sanitation.** The district court explained that a sanitary environment is a basic human need that must be met by all penal institutions. *See Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996). Plaintiffs' expert opined that Defendants were not complying with their own standards, noting that: (a) all areas, including floors and toilets, were badly soiled; (b) hold rooms lacked trash receptacles; (c) toilet stalls lacked waste receptacles for sanitary napkins, diapers, and other bathroom waste; (d) cleaning supplies were not segregated from food storage; and (e) "cleaning crews did not appear to clean and sanitize common-touch points in detainee areas." Although prison standards require one toilet for every 12 male prisoners and one toilet for every 8 female prisoners, in most cases the number of toilets in each holding room was inadequate. One large holding room with a capacity of 88 had one working toilet and one non-flushing toilet. Moreover, many toilets were combined sink/toilet fixtures with the sink fixture on top of the toilet creating a potential for contamination.

Defendants responded that all but one holding cell are cleaned twice a day, and that they had begun placing trash receptacles in the holding cells. Defendants further asserted that soap had been made available to detainees upon request, and that, where water fountains were inoperable, water coolers had been placed in the cells.

The district court preliminarily ordered "compliance monitoring to ensure detainees have access to working toilets and sinks, soap, toilet paper, garbage receptacles, tooth brushes and toothpaste, feminine hygiene items, baby food, diapers and clean drinking water."

The district court was also critical of the lack of shower facilities. It noted that a person who had been trudging across the Arizona desert would likely be dirty, but only two stations had shower facilities, and those were sparsely used, generally for detainees who were suspected of having scabies. Only 115 detainees out of the 16,992 held between June 10 and September 28, 2015 were given showers.

Addressing the lack of shower facilities, the district court noted that jail standards require access to showers and washbasins with hot and cold running water, with daily showers available. Defendants responded that the lack of showers was not a problem because most detainees are transferred within 72 hours and TEDS standards only require that reasonable efforts be made to provide showers for detainees approaching 72 hours of detention.

The district court was critical of Defendants' failure to recognize the basic human need to wash during detention, but also noted that courts are extremely reluctant to find constitutional violations based on temporary deprivations of

personal hygiene.  Accordingly, the court preliminarily ruled that Defendants "need only provide some means or materials for washing and/or maintaining personal hygiene when detainees are held longer than 12 hours."

**3. Medical Care.**  The parties agreed that Defendants are constitutionally required to provide ready access to medical care, but disagreed on the contours of this right.  Plaintiffs challenged the adequacy of Defendants' intake screening, alleging that: (1) the screening is performed by Border Patrol agents, not doctors, nurses, or other specially trained personnel; (2) Defendants do not maintain a medical treatment program capable of responding to emergencies because they do not have medical staff on site; and (3) "the practice of confiscating incoming detainees' medication creates impermissible and heightened risk that detainees will experience a medical emergency."

Defendants responded that TEDS standards provide a system of ready access to adequate medical care.  Before a detainee is placed in a hold room, an agent questions the individual and visually inspects for any sign of injury, illness, or physical or mental health concerns.  Observed or reported injuries or illnesses are to be communicated to a supervisor and documented in the appropriate electronic system. Treatment plans and medication should accompany detainees when they are transferred or discharged.  Defendants asserted they have personnel at the stations who can treat emergencies, and routinely transfer detainees to hospitals for emergency care.

Plaintiffs' expert, however, claimed that there was no evidence of any formalized screening process being carried out by agents at the detention centers.  The e3DM data system

reflected around 527 incidents of medical treatment for approximately 17,000 detainees. The expert explained there are two components to screening: (1) immediate medical triage to determine whether there is any issue that would preclude acceptance into the facility, and (2) a more thorough medical and mental health screening. The expert was critical of the field screening because it was not done pursuant to any standardized protocol, and therefore did not adequately identify urgent or emergent health care needs or potentially communicable diseases.

The district court preliminarily required compliance with TEDS standards, "including measures to ensure the Medical Screening Form currently being used by Defendants at some stations is used in all stations, and that the form ask questions to ensure compliance with TEDS standards for screening and delivering medical care."

## C. Preliminary Injunctive Relief

Having held that Plaintiffs were likely to succeed on the merits, the district court considered the other criteria for issuing a preliminary injunction. It held that Plaintiffs were likely to suffer irreparable harm due to the deprivation of constitutional rights in the conditions of confinement, which cannot be adequately remedied through damages. The balance of equities and public interest favored relief, in part, because the "government suffers no harm from an injunction that merely ends unconstitutional practices and/or ensures that constitutional standards are implemented." *See Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). The district court concluded that Defendants "cannot sidestep reality by relying on the structural limitations of the Border Patrol detention facilities." Rather, "[i]f detainees are held

long enough to require them to sleep in these facilities, take regular meals, need showers, etc., then the Defendants must provide conditions of confinement to meet these human needs." Although it found no evidence of intent to punish, the court found "no objectively reasonable relationship between 24-7 immigration processing or security and the conditions of confinement which Plaintiffs have preliminary shown exist in the Tucson Sector Border Patrol stations related to sleeping, sanitation, food, and medical care."

The court ordered:

> 1.  Clean bedding, which Defendants assert they are providing to all detainees, must include a mat and a Mylar blanket for all detainees being held longer than 12 hours.
>
> 2.  Personal hygiene needs of detainees held longer than 12 hours include the need to wash or clean themselves.
>
> 3.  Defendants shall implement the universal use of their Medical Screening Form at all stations and ensure that the form questions reflect the TEDS requirements for delivery of medical care to detainees.[1]

---

[1] The district court further ordered that "Defendants shall monitor for compliance the following: availability of working sinks and toilets and/or other materials sufficient to meet the personal hygiene needs of detainees on a per cell per station basis; cell temperatures; cell sanitation and cleanliness; delivery to detainees of bedding, including mats, personal hygiene items such as toilet paper, toothbrushes and toothpaste, feminine hygiene items, baby food, diapers, and meals."

## D.  The January 3, 2017 Order

Defendants sought reconsideration and modification of the preliminary injunction.  The motion outlined the Border Patrol's compliance with the preliminary injunction. Detainees were being provided with mats, showers were being offered to some detainees and others were being given body wipes to clean themselves, all stations were provided with the current medical screening forms, and all stations had been instructed to monitor for compliance with TEDS standards for medical screening.  Defendants, however, sought reconsideration asserting that: (a) allowing detainees to lie down to sleep had significantly reduced the holding cell capacity numbers, and had interfered with their ability to transfer individuals efficiently; (b) compliance had increased processing time; (c) compliance had added obstacles to Defendants' compliance with the Prison Rape Elimination Act, which requires separating and monitoring vulnerable populations; and (d) compliance had resulted "in prosecutions forfeited for lack of timely presentment."

The district court denied the request for reconsideration. It noted that providing detainees with mats and allowing them to lie down to sleep would always require that Defendants acquire more space.  The district court was not persuaded by Defendants' assertion that due to their 24-7 operational needs, they could not separate out detainees who approach 12 hour detentions.  The court noted that it had seen empty cells adjacent to full cells and that Defendants admitted to separating out at-risk vulnerable population detainees.  The court further stated that Defendants sought to suspend the 12-hour limit "without offering any plan or time-line for full compliance," and the court "cannot suspend what it believes are constitutional rights."

The district court did clarify its order. It explained that: (1) for detainees held more than 12 hours, "Defendants must provide bedding, including mats and Mylar blankets and some means to maintain personal hygiene;" (2) the court "did not order Defendants to provide showers;" and (3) "the 12-hours begins to run from when the detainee arrives at the station."[2]

## III.  ANALYSIS

### A.  Standard of Review

Plaintiffs are entitled to preliminary injunctive relief if they show: (1) likely success on the merits; (2) likely irreparable harm absent preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public's interest. *Pimental v. Dreyfus*, 670 F.3d 1096, 1105–06 (9th Cir. 2012); *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009). Under our "sliding scale" approach, a stronger showing of one element may offset a weaker showing of another, as long as plaintiffs "establish that irreparable harm is *likely*." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

A preliminary injunction should be set aside only if the district court "abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact." *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1103 (9th

---

[2] Out of an abundance of caution, Defendants had initially calculated the 12 hours from the moment an individual was apprehended, rather than the individual's "book-in to a station." The clarification accommodated the Border Patrol's concern that apprehensions often occur in remote areas long distances from their stations.

Cir. 2016) (quotation omitted). Legal conclusions are reviewed de novo. *Pimental*, 670 F.3d at 1105. A district court "necessarily abuses its discretion when it bases its decision on an erroneous legal standard." *Harris v. Bd. of Supervisors of Los Angeles Cnty.*, 366 F.3d 754, 760 (9th Cir. 2004) (quoting *Rucker v. Davis*, 237 F.3d 1113, 1118 (9th Cir. 2001) (en banc), *rev'd on other grounds*, *Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125 (2002).

If the district court identifies the correct legal standard, "it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quotation omitted). Rather, the court only abuses its discretion when its application of the standard is "illogical, implausible, or without support in inferences that may be drawn from the record." *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc).

Furthermore, we have held that the district court has broad discretion to fashion remedies once constitutional violations are found. *Hoptowit v. Ray*, 682 F.2d 1237, 1245 (9th Cir. 1982), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995).

## B. The District Court Properly Read and Applied *Bell v. Wolfish*

On appeal, Defendants assert that the district court misinterpreted and misapplied *Bell*. They argue that the court disregarded the Supreme Court's caution against courts becoming enmeshed in the minutiae of facility operations and

"failed to take any meaningful account of the unique nature of detention at Border Patrol facilities."

Defendants' arguments are not well taken.  The district court repeatedly cited *Bell* and recognized the Court's admonition to defer to legitimate governmental objectives. However, the Supreme Court said much more.  It set forth the standard for determining whether a condition of confinement was "imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose."  441 U.S. at 538.  The Court noted that a condition would not constitute punishment if it was "reasonably related to a legitimate governmental objective."  *Id*. at 539.  But if a condition "is arbitrary or purposeless—a court permissibly may infer that the purpose of the government action is punishment that may not constitutionally be inflicted on detainees."  *Id.*  The district court applied this standard.

At its core, Defendants' objection that the district court "failed to take any meaningful account of the unique nature of detention at Border Patrol facilities" is not a challenge to the district court's interpretation of *Bell*, but a disagreement with the application of *Bell* to the facts in this case.  As such, Defendants must show an abuse of discretion—that the district court's order "is illogical, implausible, or without support in inferences that may be drawn from the record." *Hinkson*, 585 F.3d at 1262.

The record reveals that the district court sculptured the relief granted to reflect the unique features of Border Patrol stations and field operations.  It did so by requiring only mats and Mylar blankets instead of beds and mattresses, by allowing body wipes for cleaning rather than showers, and by allowing non-medical personnel to medically screen

detainees.[3]  The limited injunction reflects the district court's careful consideration of the unique nature of Border Patrol stations in light of *Bell*.

The only aspect of the preliminary injunction that Defendants specifically challenge on appeal is the allegedly "rigid" requirement that they provide mats to all individuals detained for 12 hours or more.  However, Defendants do not contest that detainees may sleep while in custody, or even that the 12-hour mandate might be workable in some cases.  Rather, they argue that the rule "ignores the purpose of Border Patrol custody"; that it might be counterproductive if an individual arrives at the station in the middle of the night and is likely to be transferred in the afternoon; and, lacks a safety valve for a "surge" or other unforeseen situations.

These arguments are not persuasive.  First, it is not unreasonable to infer that a person who has been detained in a station for over 12 hours (after having been awake for some period of time before his detention) has a right to lie down and rest, even in the middle of the day.  Second, it is by no means clear that providing detainees with mats after 12 hours is more burdensome than providing them with mats at any other time.[4]  Third, there is little to no evidence that providing detainees with mats interferes with the Border Patrol's identification and processing of individuals.  Fourth, there is nothing in the record to suggest that Defendants ever sought

---

[3] In addition, the district court allowed the lights in the holding cells to remain on all night.  Plaintiffs do not challenge this on appeal.

[4] At oral argument, Defendants' counsel stated that detainees are presently being given a blanket and mat when initially admitted to a holding cell.

"surge" protection from the district court. Indeed, the Motion for Clarification alleged that providing detainees with mats would reduce the holding cells' capacities. It did not allege that providing mats was in itself burdensome or that there was some need for flexibility.

In light of the deference due the district court in fashioning preliminary relief, *Hinkson*, 585 F.3d at 1262, Defendants have not shown that the district court abused its discretion in granting the limited preliminary injunction.[5]

## C. Plaintiffs Have Not Shown that the District Court Abused its Discretion in Issuing Only a Limited Preliminary Injunction

Plaintiffs have not shown that the district court's application of the law concerning beds, showers, and medical care to the facts in this case is illogical, implausible, or "without support in inferences that may be drawn from the facts in the record." *Id*.

---

[5] Defendants' concerns that the preliminary injunction is "a derogation of fundamental principles of national sovereignty" or may violate the Immigration and Nationality Act because courts are prohibited "from fashioning class wide injunctive relief that would enjoin or restrain the operation of the detention provisions of the Act," overstates the situation and the law. "Plaintiffs do not seek to prevent Defendants from inspecting, apprehending, excluding, or removing aliens," and do not "challenge the government's power to detain individuals who are suspected of crossing the nation's borders without proper authorization." Defendants have offered no case law suggesting that constitutional obligations may not indirectly implicate the manner and means by which the government carries out its responsibilities at the border. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1120–21 (9th Cir. 2010).

**1. Beds.** Plaintiffs argue that detainees held overnight are entitled to beds and mattresses. *See Thompson*, 885 F.2d at 1448 (noting that "a jail's failure to provide detainees with a mattress and bed or bunk runs afoul of the commands of the Fourteenth Amendment"). But given the unique purpose of Border Patrol stations and Defendants' limited resources, the district court reasonably limited preliminary relief to mats and Mylar blankets. The purpose of the stations is to process the detainees as efficiently as possible so that they may be transferred to other facilities or released. Defendants assert that, absent the influx of detainees in 2015, processing a person should have taken two or three hours. Thus, were the stations operating as intended, there would never have been any need for a bed or a mat. Accordingly, the stations are not set up to accommodate beds. Defendants have neither the space for beds and mattresses, nor, presumably, beds and mattresses that might be immediately moved to the stations. Under these conditions, granting Plaintiffs the immediate preliminary relief of mats and Mylar blankets was reasonable. It provides Plaintiffs with actual relief without imposing a huge cost on Defendants to alleviate what might be a temporary need. Evidence as to whether the need was likely to continue would certainly be relevant to the district court's determination of Plaintiffs' request for a permanent injunction. However, the possibility of such evidence does not undermine the logic and reasonableness of the district court's preliminary injunction, which provided immediate and effective, if limited, relief by requiring Defendants to provide mats and blankets.

**2. Showers.** Plaintiffs assert that detainees have a right of access to showers. *See, e.g.*, *Toussaint v. McCarthy*, 597 F. Supp. 1388, 1399 (N.D. Cal. 1984) (holding that "minimum standards of decency require that lockup inmates

without hot running water in their cells be accorded showers three times per week in facilities reasonably free of standing water, fungus, mold and mildew"), *aff'd in part and rev'd in part* by *Toussaint v. McCarthy*, 801 F.2d 1080 (9th Cir. 1986). However, practical considerations support the district court's grant of limited relief allowing Defendants to provide Plaintiffs with body wipes to maintain a minimal level of personal hygiene. Apparently, only two of the eight stations even have showers. Moreover, unlike body wipes (and mats and blankets), which can be efficiently distributed, providing showers for thousands of detainees raises substantial security and logistical concerns. Diverting Defendants' limited human resources to provide detainees with showers would almost certainly slow down the processing of detainees, thereby encumbering Defendants' primary mission.

Furthermore, although Plaintiffs have a right to hygiene, the Constitution does not requires access to a shower within 12 hours or even 24 hours. The district court in *Toussaint*, held that inmates were entitled to showers three times a week. 597 F. Supp. at 1399. But case law does not compel the conclusion that they have a constitutional right to a shower when detained for fewer than two days.

**3. Medical Care.** There is no question that detainees are entitled to "adequate medical care." *See Toussaint*, 801 F.2d at 1112 ("If plaintiffs correctly contend that unqualified personnel regularly engage in medical practice, precedent indicates that the prison health care delivery system may reflect deliberate indifference to plaintiffs' medical needs."); *Hoptowit*, 682 F.2d at 1252 ("Medical staffing is inadequate. Medical services are provided by nurse practitioners or physician assistants (mid-level practitioners), rather than physicians."); *Gibson v. Cty. of Washoe*, 290 F.3d 1175,

1187–89 (9th Cir. 2002). However, Plaintiffs have failed to show that the district court's determination is not a reasonable application of case law to the particular facts in this case. In particular, precedent allows considerable flexibility as to when and how constitutionally "adequate medical care" is provided.

The cases cited by Plaintiffs concern settings different from those at issue here, and do not hold that all medical screening must be done by medical professionals. First, *Hoptowit* concerned medical care at the Washington State Penitentiary. 682 F.2d at 1245. We agreed with the district court that the existing conditions violated the Eighth Amendment. *Id.* ("The Eighth Amendment requires that prison officials provide a system of ready access to adequate medical care."). However, we held that remedies ordered by the district court were overbroad, and that "the court could go no farther than to bring the medical services up to the constitutional minima." *Id.* Although prisoners must be able "to make their medical problems known to the medical staff," the referrals may be to "facilities outside the prison if there is reasonably speedy access to these other physicians or facilities." *Id.* We were particularly critical of the district court's order that the penitentiary hire full time physicians, stating that the court must first determine that the penitentiary's use of outside services "could not meet the constitutional minimum." *Id.* at 1254.[6]

---

[6] We explained:

> The district judge could find that in-prison staff was necessary if he found that the State's approach was necessarily inadequate. He made no findings, however, concerning the availability and adequacy of treatment outside the prison. It could well be that with improved

Second, *Toussaint* concerned conditions of confinement at four California prisons.  801 F.2d at 1085.  Health care at the Folsom Prison was only one of the issues the Ninth Circuit addressed.  *Id*. at 1111–12.  We recognized that denying prisoners medical attention may constitute a violation of the Eighth Amendment "if the denial amounts to deliberate indifference to serious medical needs of the prisoners."  *Id*. at 1111 (citation omitted).  However, we remanded the plaintiffs' claim that the defendants placed "an unconstitutional degree of reliance on MTAs [medical technical assistants], registered nurses (RNs) and inmate workers."  *Id*.  We explained:

> Defendants respond that MTAs, RNs and inmates are qualified to perform a number of services.  If plaintiffs correctly contend that unqualified personnel regularly engage in medical practice, precedent indicates that the prison health care delivery system may reflect deliberate indifference to plaintiffs' medical needs.  Therefore, we must remand for entry

---

mid-level staffing in the prison, improved transportation, and an adequate plan for medical treatment in the community, the approach taken by the State would be constitutionally permissible. Before the district judge ordered the prison to hire in-house physicians and effectively scrap its approach to medical services, he should have first determined that this approach could not meet the constitutional minimum. Absent such a finding, the district court should have ordered the prison officials to improve the in-house staffing and procedures within the framework of the penitentiary's approach to medical services.

*Hoptowit*, 682 F.2d at 1254.

> of explicit factual findings regarding the
> nature of services performed by MTAs, RNs,
> and inmates, their level of medical
> qualification, and the level of qualification
> required to adequately render the services that
> they perform.

*Id*. at 1111–12 (citation omitted). Thus, not all use of "unqualified" medical personnel is prohibited by the Constitution. Rather, *Toussaint* proscribes having "unqualified personnel regularly engage in medical practice."

We find the third case cited by Plaintiffs, *Gibson*, to be so different from the case before us as to have little application. 290 F.3d 1175. Stephen Gibson, who suffered from manic depressive disorder, died of a heart attack while resisting being moved to a special watch cell in the county jail. *Id*. at 1181–83. His wife and children filed a § 1983 due process action against the Washoe County Sheriff's Department alleging excessive force, deliberate indifference to Stephen's serious mental health condition, and that the deputies' actions resulted from the practices of the Sheriff's Department. *Id*. at 1184. The district court granted summary judgment for the defendants. *Id*. at 1185. We reversed in part, holding that the County, but not the individual deputies, could be liable for deliberate indifference. Plaintiffs cite *Gibson* as establishing a right, at the intake stage, "to competent treatment encompass[ing] a right to prompt screening by medical staff, which is necessary to identify health emergencies, medication needs, and contagious diseases requiring quarantine." Plaintiffs overlook that, in *Gibson*, we determined that the County's potential liability for deliberate indifference was based on review of the County's past practices and its

policies.**[7]**  The record before us does not contain similar evidence of deliberate indifference by the Border Patrol to the detainees' medical needs.

Moreover, while Plaintiffs are entitled to adequate medical care, our precedent does not require that all stages of medical care be provided by trained medical staff.  Rather, our opinions in *Hoptowit* and *Toussaint* held that, before directing an agency to retain medical personnel, a court must first evaluate whether the government's proposed plan adequately meets the detainees' medical needs.

Defendants assert that Border Patrol agents have training as first responders, and that some have training as EMTs and Paramedics.  They also represent that agents receive "training to identify communicable diseases and regularly interact with and observe detainees, and any detainee presenting any symptoms of such conditions is transferred to a hospital and provided medical care."

The record does not indicate that the existing system of medical care, as directed by the district court, is inadequate. The most that Plaintiffs have shown is a low percentage of

---

**[7]** We noted that it was the County's policy that the jail's medical unit be staffed 24 hours a day by licensed medical personnel and that when arrested, a person was to be medically screened.  *Gibson*, 290 F.3d at 1183.  For many years, the County "had employed . . . a full-time clinical mental health worker at the jail to perform mental health screening," but at the time of Gibson's death the County did not have a mental health worker "because of a soured relationship between the jail's medical staff and the mental hospital."  *Id*. at 1184.  We stated that "the record suggests that the County not only knew that it had to treat the mentally ill in order to avoid harm, but that it had made a practice of ignoring this need."  *Id*. at 1191.

the detainees received medical treatment (3%), and a few incidents of inappropriate action.**[8]**  Indeed, there is no evidence of Defendants denying critical medical care to a detainee with dire consequences.  As most detainees are released within a day or two, medical care may have been delayed, rather than denied.

In addition, Defendants assert that complying with TEDS standards should provide detainees with adequate access to their prescriptions because these standards provide for detainees' medications to "be self-administered under the supervision of an officer/agent," and both parties' experts agreed that "referring a patient to the hospital to obtain a U.S. prescription" is acceptable.

Plaintiffs' reply brief reveals little or no evidence of inadequate medical treatment of detainees.  Plaintiffs question whether Border Patrol agents really receive training as first responders and note that very few have training as EMTs and Paramedics.  This may be true, but says nothing about the adequacy of medical care currently delivered. Plaintiffs argue that it cannot be true that all medical issues are referred to the hospital when medical treatment is needed,

---

**[8]** Plaintiffs relate instances where: (1) the agents withheld a pregnant woman's medication even though she yelled in pain, and told her not to cry because she was just going to be deported; (2) a woman's medication for an ovarian cyst was confiscated and withheld for the 12 hours she was detained; (3) the government confiscated a woman's migraine-headache medicine after she turned herself in to the Border Patrol; and (4) the government ignored a man's plea for the prescription medication he needed to treat a painful heart condition.  Accepting that these actions were wrong, Plaintiffs have not shown that the errors were not corrected. Moreover, they are not sufficient to establish a practice or policy that requires preliminary injunctive relief.

because only 527 out of 17,000 detainees were referred to the hospital. But this low number is not unreasonable given that over half of the detainees are processed in less than 24 hours. Plaintiffs also argue that Defendants overstate their expert's claims concerning their ability to identify and treat communicable diseases. But this is not evidence that detainees with symptoms of a communicable disease are not identified, segregated, and treated, if necessary. Finally, Plaintiffs challenge whether the practice of confiscating medications at intake is an acceptable practice, and argue that hearsay declarations concerning Plaintiffs' medication claims are admissible at a preliminary injunction hearing. Again, this is not evidence that Defendants have not provided, or will not provide, adequate medical care.

We do not question that Plaintiffs have real and substantial concerns with the adequacy of the medical care provided to detainees. Rather, we hold only that Plaintiffs have not shown that the district court abused its discretion in determining, as a preliminary matter, that Defendants, by complying with the TEDS standards, are providing adequate medical care. Plaintiffs have not carried their burden of showing that the district court's decision is "illogical, implausible, or without support in inferences that may be drawn from the record." *Hinkson*, 585 F.3d at 1262.

## IV.  CONCLUSION

This litigation arises out of the influx of detainees in the Tucson Sector of the U.S. Border Patrol in 2015. The district court carefully considered Plaintiffs' allegations of constitutional violations, recognized the guidance provided by the Supreme Court in *Bell*, 441 U.S. 520, and issued a limited preliminary injunction requiring Defendants to

provide detainees with mats and blankets after 12 hours. Defendants have failed to show that, in doing so, the district court misapprehended *Bell* or that the preliminary injunction is overly rigid or burdensome. We also find unpersuasive Plaintiffs' assertions that the district court should have required Defendants to provide detainees with beds, showers, and medical treatment provided by medical professionals. Plaintiffs have not shown that the district court's determinations were "illogical, implausible, or without support in inferences that may be drawn from the record." *Hinkson*, 585 F.3d at 1262. The district court recognized the unique mission of the Border Patrol and, at least for the purposes of a preliminary injunction, reasonably balanced the government's interests and the detainees' constitutional rights. The district court's orders are **AFFIRMED**.