FILED

10/09/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0288

DA 23-0288

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 227

PLANNED PARENTHOOD OF MONTANA,
and SAMUEL DICKMAN, M.D., on behalf of
themselves and their patients,

        Plaintiffs and Appellees,

    v.

STATE OF MONTANA, by and through AUSTIN
KNUDSEN, in his official capacity as Attorney General,
the MONTANA DEPARTMENT OF PUBLIC HEALTH
& HUMAN SERVICES, and CHARLIE BRERETON,
in his official capacity as Director of the Department of
Public Health and Human Services,

        Defendants and Appellants.

APPEAL FROM:    District Court of the First Judicial District,
                    In and For the County of Lewis and Clark, Cause No. ADV-2023-231
                    Honorable Mike Menahan, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

                Austin Knudsen, Montana Attorney General, Michael D. Russell, Thane
                Johnson, Alwyn Lansing, Michael Noonan, Assistant Attorneys General,
                Helena, Montana

                Emily Jones, Special Assistant Attorney General, Jones Law Firm, PLLC,
                Billings, Montana

        For Appellees:

                Raph Graybill, Graybill Law Firm, PC, Great Falls, Montana

                Dylan Cowit, Planned Parenthood Federation of America, Inc, New York,
                New York

                Diana O. Salgado, Planned Parenthood Federation of America, Inc.,
                Washington, District of Columbia

                Michelle Nicole Diamond, Alex W. Miller, Rishita Apsani, Sean Chang,
                Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York

Peter Kurtz, Wilmer Cutler Pickering Hale and Dorr LLP, Denver, Colorado

For Amici American College of Obstetricians and Gynecologists, Society for Maternal-Fetal Medicine, and Society of Family Planning:

Rylee Sommers-Flanagan, Dimitrios Tsolakidis, Mikaela Koski, Upper Seven Law, Helena, Montana

Nicole A. Saharsky, Mayer Brown LLP, Washington, District of Columbia

For Amici Legal Voice, Montana Coalition Against Domestic & Sexual Violence, Asian Pacific Institute on Gender-Based Violence, Coalition Ending Gender-Based Violence, The National Domestic Violence Hotline, and Sexual Violence Law Center:

Matthew Gordon, Perkins Coie LLP, Seattle, Washington

Submitted on Briefs:  May 8, 2024

Decided:  October 9, 2024

Filed:

_____
Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1     Defendants and Appellants the State of Montana, by and through Austin Knudsen in his official capacity as Attorney General, the Montana Department of Public Health & Human Services (DPHHS), and Charlie Brereton, in his official capacity as Director of DPHHS (collectively, "the State") appeal from the preliminary injunction issued by the First Judicial District Court, Lewis and Clark County.  The District Court's preliminary injunction enjoined two laws regarding abortion—HB 575 and HB 721—passed by the Montana Legislature during the 2023 session.

¶2     We address the following restated issue on appeal:

*Whether the District Court manifestly abused its discretion by granting a preliminary injunction which enjoined HB 575 and HB 721.*

¶3     We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

¶4     During the 2023 legislative session, the Montana Legislature passed several abortion-related bills.  This case deals with two of them—HB 721 and HB 575.

¶5     HB 721 prohibits dilation and evacuation (D&E) abortions, subjects providers who perform D&E abortions to substantial criminal penalties, including up to 10 years' imprisonment, and deems a provider who performs a D&E abortion to have committed "unprofessional conduct" and imposes a mandatory 1-year suspension of that provider's license to practice medicine in Montana.  HB 721 contains an exception allowing a D&E abortion "in a medical emergency," which the bill specifically notes "does not include mental or psychological conditions."  In Montana, D&E is the only abortion procedure

3

available in an outpatient setting at or after approximately 15 weeks past a patient's last menstrual period (LMP).

¶6      HB 575 amends two statutes, §§ 50-20-104, -109, MCA, prohibits any abortion of a fetus that is "viable, unless necessary to preserve the life of the mother," and requires that prior to any abortion a "determination of viability must be . . . made in writing by the physician or physician assistant performing an abortion and include the review and record of an ultrasound[.]"  Essentially, HB 575 requires a patient to obtain, and an abortion provider to review, an ultrasound prior to an abortion.  An ultrasound is a procedure which can only be performed in person, while medication abortions—the most common form of abortion early in pregnancy, up to 11 weeks LMP—are typically able to be provided via direct-to-patient telehealth, without the need for an in-person visit.

¶7      On April 10, 2023, Planned Parenthood of Montana (PPMT) and Dr. Samuel Dickman, PPMT's Chief Medical Officer, (collectively "Providers") filed a verified complaint alleging HB 721 was unconstitutional.  Providers sought a temporary restraining order (TRO) and preliminary injunction against HB 721, which the District Court denied as premature because the governor had not yet signed HB 721 and there was therefore no law to enjoin.  On May 3, 2023, Providers filed a verified amended complaint, adding additional claims asserting HB 575 was unconstitutional.  That same day, Providers sought a TRO and preliminary injunction against HB 575, which was signed by the governor on May 3, 2023.  On May 4, 2023, the District Court issued the requested TRO regarding HB 575 and set a hearing on Providers' request for a preliminary injunction.  On May 8, 2023, the District Court issued an order continuing the preliminary injunction hearing until

4

May 23, 2023. On May 16, 2023, the governor signed HB 721 and Providers sought a TRO and preliminary injunction in the District Court that same day. On May 18, 2023, the District Court issued the requested TRO regarding HB 721 and set a hearing on Providers' request for a preliminary injunction for May 23, 2023. Prior to the hearing, the parties filed a joint stipulation regarding the hearing, which had been combined with a preliminary injunction hearing in Lewis and Clark County District Court Cause No. ADV-23-299.[1] Among other things, the stipulation provided that testimony taken at the hearing regarding either case could be relied upon by the parties or the District Court in the other case and that the parties, for the purposes of the preliminary injunction hearing(s) only, stipulated to the qualifications of each other's medical experts.

¶8      The District Court held the preliminary injunction hearing on May 23, 2023. At the hearing, the court heard testimony of Dr. Dickman; Helen Weems, APRN-FNP; State Medicaid Director Michael Randol; Dr. George Mulcaire-Jones; Nicole Smith; and Dr. Steven Ralston. At the close of the hearing, the District Court orally granted the Providers' request for a preliminary injunction. The court noted it was considering the recently-revised preliminary injunction standard, stated its belief that "the purpose of an injunction is to maintain the status quo," and granted the requested preliminary injunction of HB 575 and HB 721 "based upon the evidence and testimony presented" at the hearing.

[1] This cause dealt with a challenge to bills related to Medicaid funding of abortions. The District Court issued a preliminary injunction in Cause No. ADV-23-299, which the State appealed to this Court. In an opinion issued contemporaneously with the opinion in this case, we upheld the District Court's grant of a preliminary injunction. *Planned Parenthood of Mont. v. State*, 2024 MT ___, ___ Mont. ___, ___ P.3d ___.

5

The District Court also informed the parties it was "not sure how quickly" it would be able to issue the written orders for each of the cases covered at the hearing.

¶9 On May 24, 2023, the State filed a notice of appeal to this Court. The District Court issued its written order granting the Providers' request for a preliminary injunction on July 11, 2023. Additional facts will be discussed as necessary below.

**STANDARD OF REVIEW**

¶10 "An order granting an injunction is immediately appealable, notwithstanding the fact that the merits of the controversy remain to be determined." *Sandrock v. DeTienne*, 2010 MT 237, ¶ 12, 358 Mont. 175, 243 P.3d 1123 (citing M. R. App. P. 6(3)(e)). We review a district court's grant of a preliminary injunction for a manifest abuse of discretion. *Planned Parenthood of Mont. v. State ex rel. Knudsen*, 2022 MT 157, ¶ 5, 409 Mont. 378, 515 P.3d 301. "An abuse of discretion occurs if a lower court exercises granted discretion based on a clearly erroneous finding of fact, erroneous conclusion or application of law, or otherwise arbitrarily, without conscientious judgment or in excess of the bounds of reason, resulting in substantial injustice." *Meine v. Hren Ranches, Inc.*, 2020 MT 284, ¶ 13, 402 Mont. 92, 475 P.3d 748. A manifest abuse of discretion is one which is obvious, evident, or unmistakable. *Est. of Mandich v. French*, 2022 MT 88, ¶ 16, 408 Mont. 296, 509 P.3d 6. "The grant or denial of injunctive relief is a matter within the broad discretion of the district court based on applicable findings of fact and conclusions of law." *Davis v. Westphal*, 2017 MT 276, ¶ 10, 389 Mont. 251, 405 P.3d 73. To the extent the district court's ruling is based on legal conclusions, we review the district court's conclusions of

6

law to determine whether the court's interpretation of the law is correct. *Weems v. State ex rel. Fox*, 2019 MT 98, ¶ 7, 395 Mont. 350, 440 P.3d 4 (*Weems I*) (citation omitted).

## DISCUSSION

¶11 *Whether the District Court manifestly abused its discretion by granting a preliminary injunction which enjoined HB 575 and HB 721.*

¶12 On March 2, 2023, the Legislature amended Montana's preliminary injunction statute. 2023 Mont. Laws ch. 43, § 1. While under the previous statute, a party seeking a preliminary injunction was able to obtain a preliminary injunction "by demonstrating the criteria of one of its five subsections," *Driscoll v. Stapleton*, 2020 MT 247, ¶ 13, 401 Mont. 405, 473 P.3d 386, a party seeking a preliminary injunction since March 2, 2023, is now required to meet the amended statute's four-part conjunctive test:

> A preliminary injunction order or temporary restraining order may be granted when the applicant establishes that:
>
> (a) the applicant is likely to succeed on the merits;
>
> (b) the applicant is likely to suffer irreparable harm in the absence of preliminary relief;
>
> (c) the balance of equities tips in the applicant's favor; and
>
> (d) the order is in the public interest.

Section 27-19-201(1), MCA. The Providers sought a preliminary injunction to enjoin HB 575 and HB 721 after the amendments to the preliminary injunction statute took effect and the preliminary injunction hearing in this case took place on May 23, 2023. Accordingly, their request for a preliminary injunction is subject to the four-part conjunctive test of the amended § 27-19-201(1), MCA.

7

¶13     The Legislature amended Montana's preliminary injunction law with the intent to "mirror the federal preliminary injunction standard[.]"   Section 27-19-201(4), MCA (2023).   The basic federal standard comes from the U.S. Supreme Court's decision in *Winter v. NRDC, Inc.*, 555 U.S. 7, 129 S. Ct. 365 (2008), and requires that "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20, 129 S. Ct. at 374.   The Ninth Circuit, along with several other circuit courts, has determined the *Winter* test did not eliminate the discretion of a district court judge to preserve the status quo with provisional relief until the merits could be sorted out in cases where clear irreparable injury would otherwise result and at least serious questions going to the merits are raised.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011) (citation omitted).   "A preliminary injunction may also be appropriate if a movant raises 'serious questions going to the merits' and the 'balance of hardships . . . tips sharply towards' it, as long as the second and third *Winter* factors are satisfied."  *Disney Enters. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting *All. for the Wild Rockies*, 632 F.3d at 1134-35).

¶14     In the federal system, appellate review of a district court's grant of injunctive relief is meant to be "limited and deferential."  *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1184 (9th Cir. 2024).   In accordance with this deferential standard, appellate review of an order granting a preliminary injunction "does not extend to the underlying merits of the case." *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012)

8

(citation omitted). In general, "as long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." *Farris*, 677 F.3d at 864 (cleaned up). Under our caselaw, this Court's review of a district court's grant of a preliminary injunction is for a manifest abuse of discretion. *Planned Parenthood of Mont.*, ¶ 5. With these standards in mind, we turn to the preliminary injunctions issued by the District Court in this case.

¶15 Beyond the merits of the injunctions, the State takes issue with both the District Court's oral ruling and its written order. The State asserts the District Court "ignored" the revised preliminary injunction standard when issuing its oral injunction from the bench and that the court's written order, issued after the State appealed to this Court, "failed to properly consider the facts and demonstrated a complete lack of independent judgment." The Providers contend the District Court correctly applied the revised preliminary injunction standard in its oral ruling, which has, in any event, been superseded by the court's written order and that the State's "subjective disagreement" with the court's written order cannot demonstrate a manifest abuse of discretion.

¶16 The Providers correctly note that the District Court's oral injunction has been superseded by the written order and is no longer before this Court. We briefly note, however, that the State is incorrect in claiming that the District Court failed to consider any of the four factors of the revised preliminary injunction test of § 27-19-201(1), MCA (2023), when orally granting the Providers' request for an injunction of HB 575 and HB 721. While the District Court expressed its opinion the new standard "puts the [d]istrict [c]ourt judges in a difficult position" due to having to consider the likelihood of success on

9

the merits when neither the facts nor the legal arguments have "been fully developed during the course of the litigation," it nonetheless expressly noted it was "consider[ing]" the Legislature's "recent enactment to mirror" the federal injunction standard prior to granting the preliminary injunction "based upon the evidence and testimony presented" at the hearing. The State also takes issue with the District Court's statement about the importance of maintaining the status quo when it orally granted the preliminary injunctions regarding HB 575 and HB 721, asserting it demonstrates the court did not consider the preliminary injunction standard of § 27-19-201(1), MCA. As noted, the court did consider the revised standard. And, in any event, the District Court's belief regarding the importance of maintaining the status quo is correct. In the federal courts, which have been interpreting the *Winter* test for several years, it remains the case that "the purpose of a preliminary injunction is to 'preserve the status quo and the rights of the parties until a final judgment issues in the cause.'" *City & Cnty. of S.F. v. U.S. Citizenship & Immigr. Servs.*, 944 F.3d 773, 789 (9th Cir. 2019) (quoting *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010)).

¶17 The State next asserts that the District Court adopting the Providers' proposed order when issuing its written order in this case demonstrates a lack of independent judgment and the injunctions should be reversed on that basis. "While we discourage a district court's verbatim adoption of a prevailing party's proposed order, such an action is not *per se* error. A district court may adopt a party's proposed order where it is sufficiently comprehensive and pertinent to the issues to provide a basis for the decision." *Wurl v. Polson Sch. Dist. No. 23*, 2006 MT 8, ¶ 29, 330 Mont. 282, 127 P.3d 436 (citing *In re M.W.*,

10

2004 MT 301, ¶ 28, 323 Mont. 433, 102 P.3d 6) (internal citation omitted); *see also In re Marriage of Frank*, 2022 MT 179, ¶ 84, 410 Mont. 73, 517 P.3d 188 ("This Court has approved the verbatim adoption of findings and conclusions where they are comprehensive and detailed and supported by the evidence."). "The litmus test is whether a district court's order sets forth reasoning, based upon its findings of fact and conclusions of law, in a manner sufficient to allow informed appellate review." *Snavely v. St. John*, 2006 MT 175, ¶ 11, 333 Mont. 16, 140 P.3d 492 (citing *Shammel v. Canyon Res. Corp.*, 2003 MT 372, ¶ 28, 319 Mont. 132, 82 P.3d 912). In reviewing the findings and conclusions of a district court, our concern is "'the result and not the source[.]'" *In re Marriage of Frank*, ¶ 86 (quoting *In re Marriage of Jensen*, 193 Mont. 247, 252, 631 P.2d 700, 703 (1981)). "[T]here is no reason in the Rules or otherwise to give such adopted findings a lesser degree of weight, since once signed by the district judge they bear the imprimatur of the court." *In re Marriage of Jensen*, 193 Mont. at 253, 631 P.2d at 703-04. Our review of the District Court's order in this case shows that the order is "sufficiently comprehensive to provide a basis for its decision and for our review on appeal," *Wurl*, ¶ 29, and we turn now to addressing the substance of the court's order.

***Likelihood of Success on the Merits***

¶18 The first prong of the preliminary injunction test is whether "the applicant is likely to succeed on the merits[.]" Section 27-19-201(1)(a), MCA. "[L]ikelihood of success does not require the applicant to establish entitlement to final judgment, relief at all events on final hearing, relief at a trial on the merits, or evidence sufficient to prevail at trial." *Planned Parenthood of Mont.*, ¶ 30 (cleaned up, collecting cases). The State asserts the

Providers are not likely to succeed on the merits because they lack standing and neither HB 575 nor HB 721 violates the right to privacy, particularly when reviewed under a rational basis test. The Providers contend they are likely to succeed on the merits because both bills infringe the right to privacy and are thus subject to strict scrutiny review, under which the State failed to demonstrate the bills are narrowly tailored to prevent a medically acknowledged, bona fide health risk.

¶19 We begin with the State's argument the Providers lack standing to bring this case. In light of the "shifting legal landscape" related to abortion jurisprudence in the federal courts following *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 142 S. Ct. 2228 (2022), the State asks us to overturn decades of our own precedent which has consistently held that "health care providers have standing to assert on behalf of their women patients the individual privacy rights under Montana's Constitution of such women to obtain a pre-viability abortion from a health care provider of their choosing." *Armstrong v. State*, 1999 MT 261, ¶ 13, 296 Mont. 361, 989 P.2d 364; *see also Weems I*, ¶ 12. As we previously explained when the State recently asked us to overturn *Armstrong* in an appeal from a preliminary injunction, "we decline to overrule precedent in such an appeal, when the very purpose of a preliminary injunction is to maintain the status quo pending" the final determination on the ultimate merits of the case. *Planned Parenthood of Mont.*, ¶ 20. We decline the State's invitation to overturn decades of our own precedent and reaffirm, once again, that we "have little trouble concluding . . . that [Providers] have standing to bring their complaint" challenging the laws at issue here because they "impact[] the

constitutional rights of women patients" under the Montana Constitution's guarantee of privacy and are "directed at health care providers[.]" *Weems I*, ¶ 12 (citations omitted).

¶20 Beyond its standing argument, the State further contends that the Providers are unlikely to succeed on the constitutional merits of their claims. The State asserts that HB 575 "neither implicates nor violates" the right to privacy and that HB 721 "does not infringe on the right to a lawful pre-viability abortion." The State further suggests that the bills are subject to rational basis review post-*Dobbs*, but contends the bills withstand strict scrutiny review in any case. The Providers assert that neither bill withstands strict scrutiny review.

¶21 In *Dobbs*, the U.S. Supreme Court held that "rational-basis review is the appropriate standard for" challenges, brought under the U.S. Constitution, to state abortion regulations. *Dobbs*, 597 U.S. at 300, 142 S. Ct. at 2283. The State asserts that court's conclusion regarding the proper standard of review for that type of challenge should now govern in this Court. "[I]n our review of a preliminary injunction, we may review whether the district court applied the proper level of judicial scrutiny to enjoin an allegedly unconstitutional statute." *Mont. Cannabis Indus. Ass'n v. State*, 2012 MT 201, ¶ 13, 366 Mont. 224, 286 P.3d 1161 (*MCIA*). The Providers' challenge to HB 575 and HB 721 in this case is not brought under the U.S. Constitution, but under the Montana Constitution. Specifically, their challenge arises under the Montana Constitution's explicit right to privacy—a right which is not explicitly guaranteed in the U.S. Constitution. *Compare* U.S. Const. (no explicit right to privacy), *with* Mont. Const. art. II, § 10 (providing an explicit right to privacy—"The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest."). "Montana

13

adheres to one of the most stringent protections of its citizens' right to privacy in the United States--exceeding even that provided by the federal constitution. Indeed, since the right of privacy is explicit in the Declaration of Rights of Montana's Constitution, it is a fundamental right." *Armstrong*, ¶ 34 (internal citation omitted). "Independently of the federal constitution, when the right of individual privacy is implicated, Montana's Constitution affords significantly broader protection than the federal constitution." *Weems v. State*, 2023 MT 82, ¶ 35, 412 Mont. 132, 529 P.3d 798 (*Weems II*). In accordance with the significantly broader protection provided by the Montana Constitution, we have long "recognized that 'legislation infringing the exercise of the right of privacy must be reviewed under a strict-scrutiny analysis,' which necessarily shifts the burden to the State to demonstrate that the legislation is 'justified by a compelling state interest and [is] narrowly tailored to effectuate only that compelling interest.'" *Weems II*, ¶ 34 (quoting *Armstrong*, ¶ 34). If either bill infringes on the Montana Constitution's right to privacy, it is subject to strict scrutiny review. *Planned Parenthood of Mont.*, ¶ 20. Statutes are presumed to be constitutional and the party challenging the constitutionality generally bears the burden of proving the statute unconstitutional. *Molnar v. Fox*, 2013 MT 132, ¶ 49, 370 Mont. 238, 301 P.3d 824 (citations omitted). "While the analysis of a statute pertaining to fundamental rights will generally require a strict scrutiny review that ultimately shifts the burden, we still begin our review with the same principle: statutes are presumed to be constitutional." *Weems II*, ¶ 34. The District Court applied strict scrutiny to both HB 575 and HB 721 as it determined both bills "implicate the right to privacy enumerated in Article II, Section 10 of the Montana Constitution by banning pre-viability

14

abortions." The court also found both bills "plainly implicate the right to privacy" by "restrict[ing] access to pre[-]viability abortions."

¶22 Here, the District Court

> applied our precedent subjecting restrictions on abortion services to strict scrutiny because they interfere with the fundamental right to privacy. *See Armstrong*[, ¶¶ 39-40]. Concluding that Montana's constitutional right to privacy "broadly guarantees each individual the right to make medical judgments affecting her or his bodily integrity and health in partnership with a chosen health care provider free from government interference[,]" we held in *Armstrong* that "Article II, Section 10, protects the right to procreative autonomy[.]" *Armstrong*, ¶¶ 2, 14. *Armstrong* also held that any legislation that interferes with this right must be narrowly tailored to effectuate a compelling interest—"a medically acknowledged, [bona fide] health risk, clearly and convincingly demonstrated." *Armstrong*, ¶¶ 34, 62.

*Planned Parenthood of Mont.*, ¶ 20. "Because the District Court found that the challenged laws restrict access to abortion services, it applied strict scrutiny under *Armstrong*. The court followed our precedent and did not commit an error of law when it employed this standard." *Planned Parenthood of Mont.*, ¶ 20. Applying strict scrutiny, we address each challenged bill in turn.

*HB 575*

¶23 HB 575 imposes a requirement that every patient seeking an abortion obtain an ultrasound prior to the procedure and that a determination of viability be "made in writing by the physician or physician assistant performing an abortion and include the review and record of an ultrasound[.]"[2] The Providers assert that HB 575 will prevent them from

---

[2] As the District Court recognized, the statute's limitation of an abortion provider to a "physician or physician assistant" is an unconstitutional interference with a woman's right of privacy to seek medical care from a qualified provider of her choice in light of our decision in *Weems II*, which invalidated a law restricting who may perform an abortion in this state to a "physician or physician

15

providing direct-to-patient medication abortions, which are provided prior to fetal viability, and often done via telehealth and typically without an ultrasound. There is no dispute that all medication abortions provided by Providers are pre-viability abortions.

¶24 The State contends HB 575 does not infringe on the right to privacy because its only effect on direct-to-patient medication abortions "is only to require an ultrasound in determining fetal viability before" a medication abortion can proceed. The District Court determined preliminarily that HB 575, by requiring an ultrasound in all cases, interferes with a patient's right to receive a medication abortion from a provider of her choice by imposing an additional medical procedure; as such, the State must demonstrate the bill is "narrowly tailored to effectuate a compelling interest—'a medically acknowledged, [bona fide] health risk, clearly and convincingly demonstrated.'" *Planned Parenthood of Mont.*, ¶ 20 (quoting *Armstrong*, ¶¶ 34, 62). "A narrowly tailored law is 'the least onerous path that can be taken to achieve the state objective.'" *Weems II*, ¶ 44 (quoting *Wadsworth v. State*, 275 Mont. 287, 302, 911 P.2d 1165, 1174 (1996)).

¶25 The State has failed to meet its burden in this regard and at this stage, based upon the evidence presented, the Providers have shown they are likely to succeed on the merits. The Providers presented evidence demonstrating that direct-to-patient medication abortions provided without an ultrasound are safe and effective. The Providers presented evidence demonstrating they only provide medication abortions until approximately 11 weeks after a patient's LMP, and that in many cases it is medically unnecessary to perform

assistant" when the State presented no evidence "abortions performed by APRNs include more risk than those provided by physicians or PAs." *Weems II*, ¶ 51.

an ultrasound to either determine gestational age or screen for an ectopic pregnancy. "In narrowly defined instances the state, by clear and convincing evidence, may demonstrate a compelling interest in and obligation to legislate or regulate to preserve the safety, health and welfare of a particular class of patients or the general public from a medically-acknowledged, [bona fide] health risk." *Armstrong*, ¶ 59. Evidence presented at the hearing, which was credited by the District Court, showed that Providers have been providing direct-to-patient medication abortions via telehealth without the need for an ultrasound, which they classify as medically unnecessary in a large number of cases because they use other methods to screen to "ensure that patients meet their medical criteria for a direct-to-patient medication abortion." Both Dr. Dickman and Dr. Ralston testified that medication abortions can be (and are) safely and effectively provided via telehealth without an ultrasound. The District Court determined preliminarily that HB 575 burdens patients by requiring them to undergo the time and expense of such a medically unnecessary procedure and forces an in-person visit on a procedure which has safely been done via telehealth for years. At this stage in the litigation, the State has not clearly and convincingly demonstrated HB 575 is "narrowly tailored to effectuate a compelling interest—'a medically acknowledged, [bona fide] health risk, clearly and convincingly demonstrated.'" *Planned Parenthood of Mont.*, ¶ 20 (quoting *Armstrong*, ¶¶ 34, 62). While the State takes issue with the District Court crediting the testimony of the Providers' experts over that of the State's expert, such a credibility determination is entirely within the province of the District Court to make. *See In re T.N.-S.*, 2015 MT 117, ¶ 24, 379 Mont. 60, 347 P.3d 1263. And such testimony remains subject to full development and

17

evaluation in the merits proceeding. Under a strict scrutiny analysis, the Providers are likely to succeed on their claim HB 575 is an unconstitutional infringement on a patient's right to privacy.

¶26 Justice Rice's Concurrence and Dissent provides the correct legal standard regarding one bill, before discarding it in favor of hypotheticals when dealing with the other. With regard to HB 721, Justice Rice correctly notes this "Court's precedent has consistently protected medical procedures and protocols approved and utilized by the medical profession to perform abortions, subject to regulation on the basis of 'a medically-acknowledged, bona fide health risk.'" Concurrence and Dissent, ¶ 49. His Dissent regarding HB 575 then completely ignores this straightforward standard on the dubious assertion that the State has no power to ensure that only pre-viability abortions are performed without forcing women to undergo a medically unnecessary procedure involving an in-person visit. While Justice Rice inaccurately claims the District Court's legal analysis was flawed because it "did not discuss the parameters of *Armstrong* that limited the reproductive right to pre-viability abortions," Concurrence and Dissent, ¶ 52, we note the District Court's order uses the term "pre-viability" 11 times and the factual content adduced at the hearing entirely involved the pre-viability procedures the Providers asserted the State was interfering with through HB 575 and HB 721. There is also no factual dispute that every single medication abortion done by the Providers is a pre-viability abortion done only until approximately 11 weeks LMP, which is 13 weeks prior to HB 575's own 24-week fetal viability presumption, making Justice Rice's digression into questioning whether HB 575 prevents post-viability abortions speculative, hypothetical,

18

and contradicted by the evidence. Specific to HB 575, the Providers presented testimony that direct-to-patient medication abortions have been safely done via telehealth without the need for an ultrasound for many years; that those abortions are safe and effective and do not require the use of an ultrasound prior to the procedure; that an ultrasound prior to a medication abortion is medically unnecessary in most cases; and both Dr. Dickman and Dr. Ralston testified that use of an ultrasound prior to a medication abortion is not the standard of care. The State's expert, Dr. Mulcaire-Jones, testified that use of an ultrasound was the standard of care; however, he has never performed an abortion and the District Court gave his testimony less weight than the Providers' experts. Justice Rice apparently distills this testimony to a finding that "ultrasounds are an approved medical procedure that is commonly utilized." Concurrence and Dissent, ¶ 53. But a doctor choosing to use an ultrasound as part of his or her own medical judgment is an entirely different scenario than that doctor being forced to require their patient to undergo a medically unnecessary ultrasound due to State decree and not medical necessity.

¶27    Justice Rice further contends HB 575 meets constitutional muster by relying on the U.S. Supreme Court's decision in *Gonzales v. Carhart*, 550 U.S. 124, 127 S. Ct. 1610 (2007). *Gonzales* is a case in which the Supreme Court upheld the constitutionality of the federal Partial-Birth Abortion Act of 2003, applying that Court's "undue burden" test, in which the Supreme Court would uphold abortion regulations unless a regulation places "a substantial obstacle" in the path of a woman seeking a pre-viability abortion. *Gonzales*, 550 U.S. at 146, 127 S. Ct. at 1626-27 (citation omitted). Obviously, that Court's "undue burden" test has since been eviscerated by *Dobbs*, but, more importantly, "the 'undue

19

burden' test is not the standard in our courts, given the Montana Constitution's more robust protections." *Planned Parenthood of Mont.*, ¶ 47 (citing *Armstrong*, ¶¶ 40-41). Finally, while Justice Rice contends he is applying strict scrutiny review to HB 575, the simple fact is that he is not reviewing HB 575 under our strict scrutiny precedent, which would require a showing that HB 575 is "narrowly tailored to effectuate a compelling interest—'a medically acknowledged, [bona fide] health risk, clearly and convincingly demonstrated.'" *Planned Parenthood of Mont.*, ¶ 20 (quoting *Armstrong*, ¶¶ 34, 62). The testimony elicited at the hearing, and credited by the District Court, demonstrated the ultrasound requirement of HB 575 had nothing to do with a medically acknowledged, bona fide health risk, because the testimony of the Providers was that use of an ultrasound prior to a medication abortion was, in most cases, "medically unnecessary." Rather than assuring the abortion is pre-viability, as Justice Rice contends—though he has manufactured this concern out of whole cloth as there is zero dispute the medication abortions at issue are all performed (at least) three months prior to any presumed fetal viability—HB 575 implicates the constitutional right to privacy and burdens patients by requiring them to undergo the time and expense of a medically unnecessary procedure and forces an in-person visit on a procedure which has safely been done via telehealth for years.

*HB 721*

¶28    HB 721 prohibits and criminalizes D&E abortions, which are the only abortion procedure available in an outpatient setting at or after approximately 15 weeks past a patient's LMP. The State asserts that by making unlawful a specific abortion procedure, D&E, HB 721 does not infringe on the right to obtain a lawful pre-viability abortion. The

20

District Court was not persuaded by this argument, and the State has not shown that it manifestly abused its discretion.

¶29 In a footnote defending the merits of HB 721 on appeal, the State, based upon its reading of *Dobbs*, once again asks this Court to overturn *Armstrong* in this appeal from a preliminary injunction. As we have previously noted, the State asked this Court to overturn *Armstrong* in such a case just two years ago. *See Planned Parenthood of Mont.*, ¶ 20. At the time of that case, *Dobbs* had already been issued by the U.S. Supreme Court. Nothing has changed in the intervening years which would compel this Court to reverse its plain statement that "we decline to overrule precedent in such an appeal, when the very purpose of a preliminary injunction is to maintain the status quo pending" the final determination on the ultimate merits of the case. *Planned Parenthood of Mont.*, ¶ 20.

¶30 Regarding HB 721 itself, the State failed to present evidence a ban on D&E abortions addresses a medically acknowledged, bona fide health risk. The Providers provide D&E abortions between approximately 15 and 21.6 weeks LMP, before fetal viability, and the procedure is safe and effective.[3] The Providers presented evidence this is the only abortion procedure currently available in an outpatient setting after 15 weeks LMP in the state of Montana. The District Court found that D&E abortions are safer than childbirth and the State's proposed alternative procedures are "less safe" and would "add risk to the patient." The State again takes issue with the District Court crediting the

---

[3] This case addresses restrictions affecting only pre-viability abortions. Section 1(6)(b)(ii) of HB 575 presumes viability at 24 weeks gestational age. The parties do not dispute this presumptive measure.

testimony of the Providers' experts over that of the State's expert, but such a credibility determination remains the province of the District Court to make. *See In re T.N.-S.*, ¶ 24. At this stage in the litigation, the State has not clearly and convincingly demonstrated HB 721 is "narrowly tailored to effectuate a compelling interest—'a medically acknowledged, [bona fide] health risk, clearly and convincingly demonstrated.'" *Planned Parenthood of Mont.*, ¶ 20 (quoting *Armstrong*, ¶¶ 34, 62). Indeed, rather than preventing risk, the evidence of record thus far demonstrates HB 721 unnecessarily *adds* risk to a patient seeking a pre-viability abortion and infringes on the right to privacy guaranteed by the Montana Constitution. Under a strict scrutiny analysis, the Providers are likely to succeed on their claim HB 721 is an unconstitutional infringement on a patient's right to privacy.

¶31 As to both bills, the Providers have demonstrated they are likely to succeed on the merits of their claims based upon the evidence presented thus far. At a minimum, they have presented "serious questions" going to the merits. *All for the Wild Rockies*, 632 F.3d at 1134. The District Court properly applied strict scrutiny and there is no manifest abuse of discretion in the District Court's determination the Providers are likely to succeed on the merits as to the unconstitutionality of HB 575 and HB 721.

***Likelihood of Irreparable Harm***

¶32 The second prong of the preliminary injunction test concerns whether "the applicant is likely to suffer irreparable harm in the absence of preliminary relief[.]" Section 27-19-201(1)(b), MCA. "For the purposes of a preliminary injunction, the loss of a constitutional right constitutes an irreparable injury." *Driscoll*, ¶ 15; *see also MCIA*, ¶ 15.

22

A privacy violation is "commonly recognize[d] . . . as causing irreparable injur[y]." *Weems I*, ¶ 25.

¶33 We have determined the Providers are likely to succeed on their constitutional claims relating to both HB 575 and HB 721—those claims being a violation of the Montana Constitution's right to privacy. In itself, the loss of that constitutional right is an irreparable injury "for the purpose of determining whether a preliminary injunction should be issued." *MCIA*, ¶ 15 (citing *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2689-90 (1976)). Accordingly, there is no manifest abuse of discretion in the District Court's determination HB 575 and HB 721 are likely to cause irreparable harm in the absence of a preliminary injunction.

### Balance of Equities and Public Interest

¶34 The third prong of the preliminary injunction test is whether "the balance of equities tips in the applicant's favor," § 27-19-201(1)(c), MCA, while the final prong of the preliminary injunction test is whether "the order is in the public interest." Section 27-19-201(1)(d), MCA. When the government opposes a preliminary injunction, these two factors "merge into one inquiry." *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021) (citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)).

¶35 The State asserts the Providers cannot meet either prong of the test because they are not likely to succeed on the merits of their claims. As we have already discussed, the State's assertion on that point is incorrect. At this stage of the proceedings, the State has not clearly and convincingly demonstrated either bill is "narrowly tailored to effectuate a compelling interest—'a medically acknowledged, [bona fide] health risk, clearly and

23

convincingly demonstrated.'" *Planned Parenthood of Mont.*, ¶ 20 (quoting *Armstrong*, ¶¶ 34, 62).

¶36 "[T]he Montana Constitution guarantees a fundamental right to access abortion care from a qualified health care provider of a woman's choice." *Weems II*, ¶ 43 (citing *Armstrong*, ¶ 75; *Weems I*, ¶ 26). As addressed in the likelihood of success prong, both HB 575 and HB 721 are likely unconstitutional infringements of that fundamental right. The balance of the equities clearly tips in the Providers' favor because "the government suffers no harm from an injunction that merely ends unconstitutional practices and/or ensures that constitutional standards are implemented." *Doe v. Kelly*, 878 F.3d 710, 718 (9th Cir. 2017) (internal quotation marks omitted). The preliminary injunction is also in the public interest because "it is always in the public interest to prevent the violation of a party's constitutional rights," *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citations omitted), and "all citizens have a stake in upholding the Constitution." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005).

¶37 There is no manifest abuse of discretion in the District Court's determination the balance of the equities tips in the Providers' favor because the government suffers no harm from an injunction which merely ends unconstitutional practices and that a preliminary injunction enjoining HB 575 and HB 721 is in the public interest because it is always in the public interest to prevent a violation of a party's constitutional rights. As such, the Providers have met all four prongs of the preliminary injunction test and the District Court did not manifestly abuse its discretion by granting their request for a preliminary injunction.

¶38 The final argument by the State is a two-paragraph assertion that the District Court's injunction was too broad as it relates to HB 575 because the "District Court could have simply enjoined the ultrasound requirement and the purported limitation on the practice of abortion to the exclusion of APRNs in light of this Court's decision in *Weems II*, but it instead enjoined HB 575 in its entirety." The State offers no substantive analysis in support of this argument other than to cite two cases involving injunctive relief, neither of which involve a challenge to the constitutionality of a statute: *Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S. Ct. 2545, 2558 (1979) (addressing whether a class action extended to a nationwide class), and *Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987) (court order that the Migrant and Seasonal Agricultural Worker Protection Act covered forestry workers nationwide).

¶39 Providers respond that in cases involving a challenge to the constitutionality of a statute, when a statute does not have a severability clause, we have consistently advised against severing unconstitutional portions unless "the remainder of the statute, if and when the unconstitutional provisions are severed, [is] complete in itself and capable of being executed in accordance with the apparent legislative intent." *Finke v. State ex rel. McGrath*, 2003 MT 48, ¶ 26, 314 Mont. 314, 65 P.3d 576. As Providers correctly note, HB 575 contains no severability clause.

¶40 Notably, in its reply brief, the State fails to respond to Providers' argument regarding the severability of unconstitutional provisions. So while we make no judgment as to whether or not the provisions of HB 575 that are not the subject of the Providers' challenge may be constitutional in their own right, we are left to speculate as to the State's

25

position regarding their severability. We have stated on numerous occasions that "we are not obligated to develop arguments on behalf of parties to an appeal, nor are we to guess a party's precise position, or develop legal analysis that may lend support to his position." *McCulley v. Am. Land Title Co.*, 2013 MT 89, ¶ 20, 369 Mont. 433, 300 P.3d 679 (citing *Botz v. Bridger Canyon Plan. & Zoning Comm'n*, 2012 MT 262, ¶ 46, 367 Mont. 47, 289 P.3d 180).

¶41 In sum, our review of the record in this case shows the District Court did not manifestly abuse its discretion by issuing a preliminary injunction enjoining HB 575 and HB 721, because the Providers are likely to succeed on the merits, would be irreparably harmed absent an injunction, the balance of the equities tips in the Providers' favor, and the injunction is in the public interest.

## CONCLUSION

¶42 The District Court did not manifestly abuse its discretion by issuing a preliminary injunction enjoining HB 575 and HB 721. The case will proceed to trial and await the District Court's decision on the ultimate merits of the Providers' claims. *See Planned Parenthood of Mont.*, ¶ 61.

¶43 Affirmed.

/S/ INGRID GUSTAFSON

We Concur:

/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER

26

Justice Jim Rice, concurring and dissenting.

¶44 I concur with the Court's determination that the District Court properly granted the preliminary injunction regarding HB 721. I dissent from the Court's determination that the District Court properly enjoined HB 575, and would reverse the preliminary injunction with regard to that bill.

¶45 I will not reiterate the entirety of my discussion, provided within the companion case of *Planned Parenthood of Montana, et al. v. State*, DA 23-0287, of the new Montana statute governing the issuance of preliminary injunctions, effective in March 2023. It is sufficient here to note that the factors now provided by § 27-19-201(1), MCA (2023), are conjunctive, and that the failure of a petitioner to satisfy all or any of the factors requires denial of the injunction request. *See Montanans Against Irresponsible Densification, LLC v. State*, 2024 MT 200, ¶ 12, 418 Mont. 78, ___ P.3d ___ ("The current test is conjunctive. That is, the applicant for an injunction bears the burden of establishing the likelihood of each element: success on the merits; irreparable harm; balance of equities; and public interest.").

¶46 I agree with the Court's determination that it is inappropriate in the context of this review of a preliminary injunction to undertake consideration of the State's request to revisit our precedent governing the issue altogether, particularly, the holding in *Armstrong*. Under the prior injunction statute, we held that we would "decline to overrule precedent" within a preliminary injunction appeal, reasoning that "the very purpose of a preliminary injunction is to maintain the status quo." *Planned Parenthood of Mont.*, ¶ 20. While the stated factors under the new statute do not expressly include maintenance of the status quo,

27

the Court notes, Opinion, ¶ 13, that federal courts continue to consider maintenance of the status quo within assessment of the expressly-stated factors, and thus I believe our reasoning in *Planned Parenthood* for declining to revisit case precedent within an appeal of a preliminary injunction remains viable. *See also Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1290 (11th Cir. 2022) ("[A] preliminary injunction is meant to keep the status quo for a merits decision, not to replace it.").

¶47 However, in my view, preservation of the status quo is not a consideration that can singularly outweigh application of the individual statutory factors, which necessarily require a legal analysis of likelihood of success on the merits, as I discussed in the companion case. While the injunction statute contemplates consideration of all the stated factors, it is clear that a petitioner's failure to establish a likelihood of success on the merits is fatal with or without consideration of the other factors. Consistent with our holding that the new statutory factors are conjunctive, the Ninth Circuit Court of Appeals has explained, as have other courts, that "[l]ikelihood of success on the merits is 'the most important' factor; if a movant fails to meet this 'threshold inquiry,' we need not consider the other factors." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (citation omitted).

¶48 As I also discussed in the companion case, establishing a likelihood of success on the merits must include consideration of the likelihood of overcoming the presumption of a challenged bill's constitutionality. "Every possible presumption must be indulged in favor of the constitutionality of a legislative act. . . . The party challenging a statute bears the burden of proving that it is unconstitutional beyond a reasonable doubt and, if any doubt exists, it must be resolved *in favor of the statute*." *Powell v. State Compensation Ins. Fund*,

28

2000 MT 321, ¶ 13, 302 Mont. 518, 15 P.3d 877 (emphasis added) (internal citations omitted). This requirement is all the more critical here, where the Plaintiffs have challenged the subject bills as being facially unconstitutional. "The crux of a facial challenge is that the statute is unconstitutional in all its applications." *Advocates for Sch. Trust Lands v. State*, 2022 MT 46, ¶ 29, 408 Mont. 39, 505 P.3d 825. Thus, in the context of a preliminary injunction request, plaintiffs must demonstrate the likelihood that the presumption of constitutionality will be successfully overcome for any application of the challenged bills. *See City of Billings v. County Water Dist.*, 281 Mont. 219, 227, 935 P.2d 246, 250 (1997) (petitioner for injunctive relief need not "prove beyond a reasonable doubt" that a challenged statute is unconstitutional, but nonetheless "must make out a prima facie case of unconstitutionality.").

¶49    Regarding HB 721, I concur that the Plaintiffs sustained this heavy burden. HB 721 prohibits with a narrow emergency exception the utilization of a particular kind of medical procedure, dilation and evacuation, to perform an abortion. The Court's precedent has consistently protected medical procedures and protocols approved and utilized by the medical profession to perform abortions, subject to regulation on the basis of "a medically-acknowledged, *bonafide* health risk." *Armstrong*, ¶ 62; *Planned Parenthood of Mont.*, ¶ 20. In response to the State's defense here that the subject procedure is inhumane and carries increased health risks, the District Court determined that "Defendants have not provided any evidence to support this claim," and thus the basis for permissible state regulation of the subject medical procedure under the Court's precedent was not proven for purposes of a preliminary injunction.

29

¶50 Further, the District Court found that dilation and evacuation abortions are "performed beginning after approximately 15 weeks LMP, before fetal viability," and are widely utilized, and thus a statutory prohibition would impair access to pre-viability abortions. Pre-viability abortions come within the reproductive right established and protected by *Armstrong*. *See Armstrong*, ¶ 49 ("Implicit in this right of procreative autonomy is a woman's moral right and moral responsibility to decide, *up to the point of fetal viability,* what her pregnancy demands of her in the context of her individual values, her beliefs as to the sanctity of life, and her personal situation.") (emphasis added). Consequently, the challenged bill would impact the defined pre-viability right by regulating medical procedures without establishment of the appropriate basis to do so as required under the Court's clear precedent. Under these circumstances, I believe Plaintiffs have satisfied their burden to establish the preliminary injunction factors, including likelihood of success on the merits under the Court's precedent, encompassing the likelihood of overcoming the presumption of constitutionality, and thus I concur with affirming the District Court's preliminary enjoinder of HB 721.

¶51 I view the challenge to HB 575 as postured significantly differently than the challenge to HB 721. HB 575 amends the Montana Abortion Control Act, § 50-20-109(1)(b), MCA, to prohibit *post-viability* abortions unless necessary to preserve the life of the mother. This is consistent with *Armstrong*. Additionally, consonant with the furtherance of that same interest, the bill amends § 50-20-104(6)(b), MCA, to require that an abortion provider make a determination of viability based upon review of an ultrasound to assess the gestational age of a fetus, and defining the same by a presumption

30

of fetal viability beginning at 24 weeks gestational age. About this issue, significant medical evidence from both sides was introduced regarding the use of ultrasounds to determine gestational age, including testimony from Plaintiffs' experts acknowledging that ultrasounds are used for this purpose in some cases. Nonetheless, the District Court concluded it was "not persuaded" that HB 575 would further the State's interest in ensuring appropriate gestational age.

¶52 However, I believe the District Court's legal analysis was flawed. The court did not discuss the parameters of *Armstrong* that limited the reproductive right to pre-viability abortions, and the State's legitimate interest in ensuring that abortion practice conforms to those constitutional parameters. The State's interest in determining gestational age is not an isolated medical issue. HB 575 employs a recognized medical procedure to ensure satisfaction with the constraints upon abortions under *Armstrong*, that is, its limitation to pre-viability abortions. Enjoining HB 575 leaves the State without a mechanism to ensure the law is followed.

¶53 Further, where the Court's precedent has not specifically addressed this kind of legislative regulation designed to ensure that abortions are performed consistent with the *Armstrong* parameters, the District Court's failure to credit HB 575 with the presumption of constitutionality, not mentioning it at all, is in my view a critical analytical error. The District Court also failed to consider that, in light of the Plaintiffs' facial challenge, HB 575 must be found to be likely unconstitutional in every possible application. But, of course, it is not. Even the testimony of the Plaintiffs' experts, accepted by the District Court,

31

acknowledged that ultrasounds are an approved medical procedure that is commonly utilized.

¶54 Seemingly lost in the discussion is a recognition that, like all constitutional rights, the right to privacy, here the right to a pre-viability abortion, is not absolute or exempt from any effort by the Legislature to assure appropriate protections for patients undergoing abortion procedures, for the pre-born child, and, as stated in the injunction statute, for the "public interest" in ensuring that the abortion services have appropriate oversight and are being properly provided. The State possesses "a police power by which it can regulate for the health and safety of its citizens." *Wiser v. State*, 2006 MT 20, ¶ 19, 331 Mont. 28, 129 P.3d 133. It cannot be that laws regulating abortion and abortion-related procedures are *per se* unconstitutional, or that the Legislature has no role to play in providing oversight to the provision of abortion services. As explained by then-Justice, and later Chief Justice, Gray, in her *Armstrong* concurring opinion, regarding the Legislature's and the public's interest in the issue:

> [I]t is necessary to comment on those portions of the Court's opinion which discuss the propriety of leaving the determination of standards for medical practice in the hands of the medical community—acting through the medical examining and licensing authorities. *I generally agree with the Court's discussion in those regards but I do not agree with any implicit notion therein that the Legislature has no place at all in the equation*. It is important to keep in mind that the practice of medicine is a privilege, not a right, in Montana and that it is generally subject to legislative oversight in order to protect the health, safety, and welfare of the people of Montana. *See* § 37-3-101, MCA. Indeed, the Montana Board of Medical Examiners (Board) is an entity created by the Legislature via § 2-15-1841, MCA, and given the powers and duties set forth in § 37-3-203, MCA, for the purpose of ensuring that medical licensees conform to appropriate standards of conduct and exercise the privileges granted to them "in the greatest public interest."

32

*Armstrong*, ¶ 79 (Gray, J., concurring) (emphasis added). We further recognized this principle in *Weems II*, ¶ 38, stating that "every restriction on medical care does not necessarily impermissibly infringe on the right to privacy," and that "Montanans do not possess an unqualified right to obtain medical care free of State regulation." As the U.S. Supreme Court has similarly explained, "[t]he government may use its voice and its regulatory authority to show its profound respect for the life within the woman." *Gonzales v. Carhart*, 550 U.S. 124, 157, 127 S. Ct. 1610, 1633 (2007). "Regulations which do no more than create a structural mechanism by which the State, or the parent or guardian of a minor, may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose." *Gonzales*, 550 U.S. at 146, 127 S. Ct. at 1627 (citing *Planned Parenthood v. Casey*, 505 U.S. 833, 877, 112 S. Ct. 2791, 2821 (1992)).

¶55 *Armstrong*'s recognition of a reproductive right to privacy focused on fetal viability as the critical juncture, and held that the right was limited to pre-viability abortions. *Armstrong* ¶ 49. By HB 575, the Legislature is, for purposes of a preliminary injunction inquiry, creating a structural mechanism to ensure that the parameters of the *Armstrong* pre-viability right are properly enforced, and is not restricting "the woman's exercise of the right to choose." *Gonzales*, 550 U.S. at 146, 127 S. Ct. at 1627. Consistent with *Armstrong*, the State is entitled to ensure that a pre-viability medical status exists for an abortion, and such an interest is compelling under a strict scrutiny review. In my view, the District Court's analysis failed to account for these considerations by failing to recognize the State's compelling interest in enforcing the *Armstrong* right, failing to accord HB 575

a presumption of constitutionality in furtherance of the state's interest, and failing to require that HB 575 be shown to be facially unconstitutional, which leads me to conclude that the District Court's determination regarding likelihood of success on the merits cannot be sustained, and the Plaintiffs' showing was insufficient.

¶56    I would affirm the preliminary injunction as to HB 721, and reverse as to HB 575.


/S/ JIM RICE